189 F.3d 808 (9th Cir. 1999)
 ROBERT CALABRETTA, individually and as parent and natural guardian of Tamar and Natalie Calabretta, minor children; SHIRLEY CALABRETTA, individually and as parent and natural guardian of Tamar and Natalie Calabretta, minor children, Plaintiffs-Appellees,
v.
JILL FLOYD, individually and in her Official capacity as a Caseworker of Yolo County Department of Social Services; YOLO COUNTY DEPARTMENT OF SOCIAL SERVICES; NICHOLAS SCHWALL, individually and in his official capacity with Woodland Police Department; USSELL SMITH, individually and in his official capacity as Chief of Police of the Woodland Police Department; WOODLAND POLICE DEPARTMENT, Defendants-Appellants.
 97-15385
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted June 8, 1998
Filed August 26, 1999
 
 [Copyrighted Material Omitted]
 J. Scott Smith, Angelo, Kilday and Kilduff, Sacramento, California, for the defendants-appellants.
 Michael P. Farris, Home School Legal Defense Association, Paeonian Springs, Virginia, for the plaintiffs-appellees.
 Stephen Bailey (briefed), Placerville, California, for the plaintiffs-appellees.
 Thomas R. Yanger (briefed), Deputy Attorney General, Sacramento, California, for amicus State of California Ex Rel. Eloise Anders, Director of the California State of Social Services.
 Kevin T. Snider (briefed), United States Justice Foundation, Escondido, California, for amicus United States Justice Foundation and Christian Action Network.
 Appeal from the United States District Court for the Eastern District of California. Lawrence K. Karlton, District Judge, Presiding, D.C. No. CV-95-00345-LKK/PAN.
 Before: J. Clifford Wallace, Thomas G. Nelson and Andrew J. Kleinfeld, Circuit Judges.
 KLEINFELD, Circuit Judge:
 
 
 1
 This case involves whether a social worker and a police officer were entitled to qualified immunity, for a coerced entry into a home to investigate suspected child abuse, interrogation of a child, and strip search of a child, conducted without a search warrant and without a special exigency.
 
 
 2
 Facts.
 
 
 3
 The two individual defendants moved for summary judgment based on qualified immunity. The district judge denied it.
 
 
 4
 Some individual called the Department of Social Services October 27, 1994, with the information that gave rise to this case. The report says that the caller was anonymous, but the report redacts names, thus it is not clear whether the caller gave her name but the Department treated her as anonymous, or whether she refused to give her name. The caller said that she was once awakened by a child screaming "No Daddy, no" at 1:30 A.M. at the Calabretta home. Then two days ago she (or someone else, possibly a Department of Social Services employee - it is not clear from the report) heard a child in the home scream "No, no, no" in the late afternoon. The caller said that the children "are school age and home studied" and that "this is an extremely religious family."
 
 
 5
 The report was put into the in box of defendant Jill Floyd, a social worker in the Department. She checked the Department files to see whether the Calabretta family had any "priors," or had ever been on welfare, and ascertained that they had no priors and had never been on welfare. She did not attempt to interview the person who had called in the report.
 
 
 6
 On October 31, four days after the call, the social worker went to the Calabretta home to investigate. Mrs. Calabretta, thechildren's mother, refused to let her in. The children were standing at the door with their mother, and the social worker noted on her report that they "were easily seen and they did not appear to be abused/neglected."
 
 
 7
 The social worker was about to go on vacation, so she requested that someone else be assigned to the case, but the investigation had not been completed when she returned. On November 10, fourteen days after the call and ten days after the first visit, the social worker returned to the Calabretta house with a policeman. She did not tell the police dispatcher about the specific allegations, just that she needed police assistance to gain access so that she could interview the children. Officer Nicholas Schwall met the social worker at the Calabretta house, knowing nothing about the case except that he had been assigned to assist her. She told him that they had received a report of the children crying, and he understood her to mean that they might have been beaten.
 
 
 8
 The policeman knocked, Mrs. Calabretta answered, and the policeman said they were checking on the children's welfare because someone had reported children crying. Mrs. Calabretta did not open the door, and said she was uncomfortable letting them in without her husband at home. The police officer had the opinion that in any check on the welfare of children "there is an exigent circumstance" so no search warrant is needed. Mrs. Calabretta and Officer Schwall disagreed in their depositions on whether Officer Schwall told her that if she did not admit them, then he would force their way in. Appellants concede that for purposes of appeal, the entry must be treated as made without consent.
 
 
 9
 The social worker then took Mrs. Calabretta's twelve year old daughter into one room while the policeman stayed with the mother in another. The twelve year old did not remember any of the children screaming "No, Daddy, no, " but did recall that at about the date of the report, her little brother hurt himself in the backyard and screamed "no, no, no. " The social worker asked what kind of discipline the parents used, and understood the twelve year old to be saying that the parents used "a round, wooden dowel, very, very thin wooden dowel," about "twice as big . . . as a pen. " The three year old came into the room at that point and said "I get hit with the stick too." The twelve year old told her, according to the social worker's report, "that her parents do not discipline indiscriminately, only irreverence or disrespect. " The social worker wrote in her report "Minor is extremely religious made continual references to the Lord and the Bible. " The social worker testified that any physical means of disciplining children "raises a red flag" for her, and "I always counsel or advise parents on other ways of discipline before they resort to corporal punishment."
 
 
 10
 While the mother was still with the policeman in the other room, the social worker told the twelve year old to pull down the three year old girl's pants. She wanted to look at the three year old's buttocks to see whether there were marks. The twelve year old did not do so, and the three year old started crying. The mother heard her daughter crying and ran in. The twelve year old said "she wants me to take down Natalie's pants." The social worker said "I understand you hit your children with objects," and went on to say "It's against the California state law to hit your children with objects. And I found out that you hit your children with objects. And I need to see Natalie's bottom to see if there are bruises there." The policeman said "I'll leave you alone to do this" and backed off. The social worker said "The rod of correction?" Mrs. Calabretta answered, "Oh, it's just a little stick," referring to "a little Lincoln log, piece of Lincoln log roofing, nine inches long." Mrs. Calabretta "explained the Biblical basis of its use" to the social worker. The social worker repeated "It's against California law to hit your children with objects. This is breaking the law. And I insist on seeing herbottom." The three year old was screaming and fighting to get loose, the mother looked at the social worker to see whether she would relent, but she did not, and the mother pulled down the three year old's pants in obedience to the social worker's order.
 
 
 11
 There were no bruises or marks on the three year old's bottom. The social worker then insisted on seeing the piece of Lincoln log roofing, and Mrs. Calabretta showed it to her. The social worker then decided not to interview or examine the buttocks of any of the other children. She "had a brief conversation with the mother in which we discussed her looking into alternative forms of discipline."
 
 
 12
 The Calabrettas sued the social worker and policeman and other defendants for damages, declaratory relief and an injunction under 28 U.S.C. S 1983. The defendants moved for summary judgment on grounds of qualified immunity. The district court denied the defendants' motion, and the social worker and police officer appeal.
 
 
 13
 Analysis.
 
 
 14
 We have jurisdiction over interlocutory appeals from denials of summary judgments denying qualified immunity.[1] On summary judgment, "even in a qualified immunity case, we must assume the nonmoving party's version of the facts to be correct."[2] Those facts must, of course, be established by evidence cognizable under Federal Rule of Civil Procedure 56. In this case, although the parties disagree on some details, the disagreements are not material to the outcome. We review denial of the qualified immunity claim de novo.[3]
 
 A. The coerced entry
 
 15
 The social worker and police officer concede that for purposes of appeal, they should be treated as having entered the Calabretta home without consent. They argue that the district court erred in holding that their non-consensual entry required special exigency or a search warrant. Their theory is that an administrative search to protect the welfare of children does not carry these requirements, and the social worker was doing just what she was supposed to do under state administrative regulations. They claim immunity for entry into the home, interviewing the twelve year old, and strip searching the three year old.
 
 
 16
 "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[4] The right the official is alleged to have violated must have been "clearly established" in an appropriately particularized sense. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."[5] The "relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. [The officer's] subjective beliefs about the searchare irrelevant."[6] "Specific binding precedent is not required to show that a right is clearly established for qualified immunity purposes."[7]
 
 
 17
 The facts in this case are noteworthy for the absence of emergency. The social worker and her department delayed entry into the home for fourteen days after the report, because they perceived no immediate danger of serious harm to the children. The police officer was there to back up the social worker's insistence on entry against the mother's will, not because he perceived any imminent danger of harm. The report that led to the investigation could have indicated a problem, but was not especially alarming. A child screaming "no, Daddy, no" late at night could mean that the father was abusing the child. But in a household where the father puts the children to bed, these words are often screamed at bedtime, and also in the middle of the night after a child has gotten up to go to the bathroom, get a drink of water, check the television, and enter his parents' room to say that he cannot sleep, when the father puts the child to bed the second time. The other scream, "no, no, no," likewise may mean abuse, or may mean that a child around two is developing a normal, healthy sense of separateness of herself as an individual and perhaps does not care for her mother's choice of vegetable. The tipster's reference to religion might imply that the tip arose from religious differences between the tipster and the Calabretta family. Had the information been more alarming, had the social worker or police officer been alarmed, had there been reason to fear imminent harm to a child, this would be a different case, one to which we have no occasion to speak.
 
 
 18
 Appellants urge us to adopt a principle that "a search warrant is not required for home investigatory visits by social workers." They claim qualified immunity on the ground that there is no clearly established principle to the contrary. The principle they urged is too broad. Anderson requires more particularized analysis, to determine whether, in these particular circumstances, notably the absence of emergency, a reasonable official would understand that they could not enter the home without consent or a search warrant.[8]
 
 
 19
 In our circuit, a reasonable official would have known that the law barred this entry. Any government official can be held to know that their office does not give them an unrestricted right to enter peoples' homes at will. We held in White v. Pierce County[9], a child welfare investigation case, that "it was settled constitutional law that, absent exigent circumstances, police could not enter a dwelling without a warrant even under statutory authority where probable cause existed."[10] The principle that government officials cannot coerce entry into people's houses without a search warrant or applicability of an established exception to the requirement of a search warrant is so well established that any reasonable officer would know it. Under White, appellants' claim, that "a search warrant is not required for home investigatory visits by social workers," is simply not the law.
 
 
 20
 Appellants urge that White speaks only to police, not social workers. That is an invalid distinction. In the case at bar, the social worker used a police officer to intimidate the mother into opening the door. Also, there is no reason why White would be limited to one particular kind of government official. The Fourth Amendmentpreserves the "right of the people to be secure in their persons, houses . . . . " without limiting that right to one kind of government official. It is not as though all reasonable people thought any government official could enter private houses against the occupants' will, without search warrant or special exigency, and then White said that police officers could not, without speaking about social workers. Rather, everyone knew that the government could not so enter houses, and White said that principle was well established, in the context of a child abuse investigation. Appellants' argument that they be allowed qualified immunity because White did not speak expressly about social workers is of the kind that Anderson rejects, "[t]hat is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . ."[11]
 
 
 21
 There is a distinction between White and the case at bar, but the distinction is of no help to appellants. In White, there was a special exigency. Someone had called in a report that the seven year old had several welts on his back. The boy and his father talked to the police officer at the door, and the boy tried to show the officer his back, but the father would not allow him to. Based on the report, and the father's violent and abusive response when questioned, the officer thought that if he delayed to get a warrant, the father would injure the child or remove him from the house before the officer returned with the warrant. We held that "the deputies had probable cause to believe the child had been abused and that the child would be injured or could not be taken into custody if it were first necessary to obtain a court order."[12]
 
 
 22
 By contrast, in the case at bar, the report did not describe any evidence of physical abuse, and the social worker and police officer did not perceive any danger of injury to the children or loss of evidence if they secured a warrant. On her first visit four days after the call, ten days prior to her return with the police officer, the social worker wrote "Minors were easily seen and they did not appear to be abused/neglected." The only reason the social worker and police officer did not seek a search warrant was that their subjective opinion was that they did not need one.
 
 
 23
 Appellants argue that Baker v. Racansky[13] limits White to the principle that compliance with a constitutionally permissible state statute entitles the government officials to immunity. That is not correct. We did not limit White at all in Baker, but merely held that it did the claimants in that case no good. Baker is not on point, because it did not involve any kind of home search, and did not turn on any child welfare exception to normal search and seizure law.
 
 
 24
 In Baker, we held that social workers were entitled, in the particular circumstances of that case, to qualified immunity for their decision to take a child into protective custody. We noted that at the time, "there was no binding Ninth Circuit or Supreme Court precedent which clearly established when state officials could or could not take a child into temporary protective custody."[14] That, of course, distinguishes Baker from the case at bar, where at the time there was binding Ninth Circuit precedent, White, which clearly established that the general law of search warrants applied to child abuse investigations. Baker also differs from the case at bar in that the investigators reasonably believed that the child was in imminent danger of abuse if they did not act. A neighbor's children reported to their mother, and to the social worker, that the child's fatherhad sexually abused them, and one of them had a vaginal rash that corroborated the accusation. When the social workers asked the father's own child if his father did anything sexual with him, the child denied it but "started walking around the room . . . would crawl up in his chair . . . went into the corner of the room, put his head in between his legs, raised his legs up, put his arms up toward his head like this, curled up."[15] The social workers thought the denial was false, because of the child's bizarre behavior when he made the denial, and thought that the mother would not be able to protect the child when the father was released from jail.
 
 
 25
 Appellants argue that other circuits have allowed broader qualified immunity, so the social worker and police officer could not have been expected to know that they were acting unconstitutionally. They cite Darryl H. v. Coler ,[16] Wildauer v. Frederick Cnty.,[17] and Franz v. Lytle,[18] and some out of circuit district court and state court decisions to show that there is no well-established right to privacy from inspections by social workers. It is not clear that a conflict among other circuits would create qualified immunity where clearly established law in this circuit would preclude it,[19] but even if it could, these cases would not establish such an open question about coerced entry.
 
 
 26
 Darryl H. involves strip searches of children, not warrantless entries into homes, and is discussed below with respect to the strip search. Wildauer involves an entry into a home, but there was apparent consent and no express objection, no criminal aspect to the investigation, no entry of a parental home to investigate parents' treatment of their children, and no investigatory purpose. The householder had nine "foster children" living with her (apparently the children were not placed there pursuant to custody orders), and two sets of parents had complained that she would not give their children back despite the absence of any custodial claim. When the social worker appeared, the householder gave two children back and said there were two more she could not find, and invited the social worker in to help look for them. The social worker came back with a nurse because many of the children were disabled and the house looked unhygienic to the social worker, but the purpose of the second look, to which no objection was made, was to see whether the children should stay there, not to investigate any crime.
 
 
 27
 We are unable to see why appellants cite Franz v. Lytle.[20] A neighbor told the police that a woman was leaving her two year old unsupervised and not changing her urine-soaked diapers. The Tenth Circuit held that the investigating police officer was not entitled to qualified immunity, for having the neighbor take off the child's diaper so that he could examine and feel the baby's vaginal area, and under the guise of investigating for sexual molestation, threatening to take the baby into protective custody to make the parents bring the baby to a hospital for further vaginal examination (which revealed no evidence of sexual molestation, a crime for which there was no evidence). The case would not have given the police officer and social worker in the case at bar any reason to think their entry into the Calabretta house and strip search of the three year old was constitutionally permissible, because to the extent that Franz was in any way analogous, the police officer lost on his qualified immunity claim.
 
 
 28
 One other circuit has spoken on facts analogous to those in the case at bar. Good v. Dauphin County Social Services,[21] like our decision in White, holds that a social worker and police officer were not entitled to qualified immunity for insisting on entering her house against the mother's will to examine her child for bruises. Good holds that a search warrant or exigent circumstances, such as a need to protect a child against imminent danger of serious bodily injury, was necessary for an entry without consent, and the anonymous tip claiming bruises was in that case insufficient to establish special exigency. In our case, the anonymous tip did not even allege bruises.
 
 
 29
 Appellants also argue that the doctrine allowing certain kinds of administrative searches without warrants or special exigency applies to social workers' entries into homes for child protection. That proposition is too broad for the kind of particularized examination of conduct in particular circumstances required by Anderson. We need not decide whether in some circumstances that doctrine might apply, because it does not apply in the circumstances of this case.
 
 
 30
 The starting point for administrative searches is Camara v. Municipal Court.[22] The case involved a routine municipal housing code inspection of an apartment house, yet the Court held that the Fourth Amendment requirement of a search warrant, consent, or exigent circumstances applied. The requirement of probable cause was diluted in the circumstances, so a warrant would be easy to obtain if an occupant would not let an inspector in without it, but a search warrant was necessary in the absence of special exigency or consent, despite the lack of any criminal investigatory purpose. Our analysis in White is consistent with Camara, and Camara is of no help to appellants.
 
 
 31
 Appellants argue that Wyman v. James,[23] establishes that where a social worker enters a house to investigate the welfare of a child, Fourth Amendment standards do not apply. It does not. Wyman holds that the state may terminate welfare where a mother refuses to allow a social worker to visit her home to see whether the welfare money is being used in the best interests of the child for whom it is being paid. It does not hold that the social worker may enter the home despite the absence of consent or exigency. Wyman distinguishes Camara on the ground that in Wyman, "the visitation in itself is not forced or compelled."[24] In the case at bar, by contrast, the entry into the home was forced and compelled.
 
 
 32
 New Jersey v. T.L.O.[25] holds that the Fourth Amendment does apply to a school administrator search of a student's purse, but that in the special context of in-school searches, the Fourth Amendment did not require a warrant or probable cause. It has no bearing on searches of a home. Appellants would have us read T.L.O. as a blanket suspension of ordinary Fourth Amendment requirements where children are involved. The Court's opinion does not support so broad a reading. The court emphasized that it was "the school setting" that "requires some easing of the restrictions to which searches by public authorities are ordinarily subject."[26] Of course there are occasions when Fourth Amendment restrictions on entry into homes are relaxed. We emphasize that in this case the officials entered without a warrant or consent simply because they thought they had a right to do so, and thought that theFourth Amendment did not apply to entries into homes where children were involved. This was not a case where the officials coercing entry into the home recognized some special exigency creating imminent risk to the child. White v. Pierce County[27] establishes that a special exigency excuses a warrantless entry where the government officers have probable cause to believe that the child has been abused and that the child would be injured or could not be taken into custody if it were first necessary to obtain a court order.
 
 
 33
 Appellants also argue that the coerced entry into the home was primarily to protect the children, not investigate crime, pursuant to California regulations. It is not clear why this would excuse them from compliance with the Fourth Amendment, in light of the Camara holding that administrative inspections of buildings are "significant intrusions upon the interests protected by the Fourth Amendment," even though not criminal, so in the absence of emergency, warrants should be obtained if consent is refused.[28] We held, years before the coerced entry into the Calabretta home, that even in the context of an administrative search, "[n]owhere is the protective force of the fourth amendment more powerful than it is when the sanctity of the home is involved . . . . Therefore, we have been adamant in our demand that absent exigent circumstances a warrant will be required before a person's home is invaded by the authorities."[29]
 
 
 34
 Nor did the California statutes and regulations direct the social worker or police officer to coerce entry into the home without a warrant or special exigency, or suggest that no warrant was needed in that circumstance. The statutes[30] appellants cite say nothing about entering houses without consent and without search warrants. The regulations they cite require social workers to respond to various contacts in various ways, but none of the regulations cited[31] say that the social worker may force her way into a home without a search warrant in the absence of any emergency. A possibly related regulation, in the chapter on "Report of Child Abuse Investigative Procedures," does speak to search warrants, but not at all helpfully to appellants. It says that the "child protective official" receiving a report should "consider the need for a search warrant."[32] This administrative regulation would tend to put the social worker on notice that she might need a search warrant, not that she was exempt from any search warrant requirements. Appellants presented no evidence they did "consider the need for a search warrant." They both imagined incorrectly that no search warrants were necessary to enter houses for child abuse investigations.
 
 
 35
 We conclude that on appellants' first issue, whether they were protected by qualified immunity regarding their coerced entry into the Calabrettas' home, the district court was right. They were not.
 
 
 36
 B. The strip search.
 
 
 37
 Appellants second issue on appeal is whether they were entitled to qualified immunity for the social worker's requiring the twelve year old to talk to her in a separate room and requiring the mother to pull down the three year old's pants. They argue that there is no authority on point in the Ninth Circuit, and the SeventhCircuit held in Darrell H. v. Coler[33] that such a visual inspection is shielded by qualified immunity. They also argue that there are so many reports of child abuse that the social workers cannot bear any additional restrictions on how they conduct their investigations. In their memorandum in support of summary judgment filed in the district court, appellants did not argue that they were entitled to qualified immunity for the interview with the twelve year old. Because this claim was not raised in the district court, it cannot be raised for the first time on appeal[34] and we have no occasion to pass on the question. The argument in the district court was limited to the proposition that the social worker violated no clearly established law in strip searching the three year old, so that is the only issue we consider.
 
 
 38
 Darryl H. is not entirely supportive of appellants' position. The strip search was conducted at the children's school, and did not involve an official takeover of the family home. The Seventh Circuit reversed a summary judgment in the social workers' favor on constitutionality of the search. The opinion says that "nude physical examination is a significant intrusion into the child's privacy" and even where the child is too young to have the same subjective sense of bodily privacy as an older child, the nude body search affects "legitimate expectations of the parents . . . , protected by the fourteenth amendment, that their familial relationship will not be subject to unwarranted state intrusion."[35] Although a warrant or probable cause was not needed, in the Seventh Circuit's view, reasonableness was under the Fourth Amendment, and there were issues of fact that precluded summary judgment regarding reasonableness. Although in Darryl H., as in the case at bar, the social worker ordered the mother to strip the child, there was a genuine issue of fact about whether the mother did so consensually or in response to coercion. Also, not much checking had been done on the validity of the tip, the children denied abuse, and there was evidence that the tipster might not be fair and objective.
 
 
 39
 Darryl H. offers some support to appellants because it held that the social workers were entitled to qualified immunity. But the strip search was not done during an unconstitutional entry into the home, and the information supporting a strip search was much stronger in Darryl H. than in the case at bar. The school principal reported "Lee H., age six, was tied up for punishment. Lee and his sister, Marlena, age seven, were thin and not allowed to eat lunch at school, and the children's clothes and bodies were dirty."[36] The principal told the social worker that "both parents were usually angry when they came to school . . . that other students indicated Lee was tied up for punishment," but "that bruises had never been observed on the children."[37] Thus, in Darryl H., the social workers had substantial reason to believe that the children were malnourished, dirty, and abusively disciplined.
 
 
 40
 By contrast with Darryl H., in the case at bar the social worker had little reason to believe that the three year old was abused. The tip itself included a reference to the Calabrettas' religious views that might suggest that the tipster was motivated by religious differences. Even if the tip was entirely accurate, a benign explanation of "no, Daddy, no " and "no, no, no" was at least as likely as any punishment,let alone abusive punishment. The social worker had noted on her first visit that "Minors were easily seen and did not appear to be abused/neglected." The twelve year old had already explained away the screaming and told the social worker that the children were not abusively disciplined. The social worker's notations refer to the religiosity of the household, but surely a family's religious views cannot justify social workers invading the household and stripping the children. The social worker plainly expressed the view to the mother that use of any object to spank a child, such as the "rod " (a nine inch Lincoln log) was illegal, and she did have reason to believe that such an object was used, but appellants have cited no authority for the proposition she was right that California law prohibits use of any object to discipline a child. The statutes we have found prohibit "cruel or inhuman" corporal punishment or injury resulting in traumatic condition.[38] While some punishment with some objects might necessarily amount to cruel or inhuman punishment, a token "rod" such as a nine inch Lincoln log would not. A social worker is not entitled to sacrifice a family's privacy and dignity to her own personal views on how parents ought to discipline their children.
 
 
 41
 The Third Circuit held, in factual circumstances much more similar than Darryl H. to the case at bar, that the social workers lacked qualified immunity for strip searching small children. In Good v. Dauphin County Social Services,[39] an anonymous tipster told Social Services that a seven year old girl had bruises on her body and said she got them in a "fight with her mother." As with Calabretta, a social worker and police officer insisted on entry, claiming that they needed no search warrant to investigate child abuse.
 
 
 42
 Good reversed a summary judgment in the social worker's and police officer's favor on qualified immunity, and held that they were not entitled to qualified immunity. Even though there was no case in point, the Third Circuit held that the general proposition was clearly established that the government may not "conduct a search of a home or strip search of a person's body in the absence of consent, a valid search warrant, or exigent circumstances."[40] Good cited a Seventh Circuit case for the proposition that "It does not require a constitutional scholar to conclude that a nude search of a thirteenyear-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human dignity."[41] Good holds that under Anderson, "a public official may not manufacture immunity by inventing exceptions to well settled doctrines for which the case law provides no support."[42]
 
 
 43
 Good distinguishes Darryl H. on the ground that in Darryl H. the social workers acted pursuant to state guidelines but they did not in Good (nor did they in the case at bar), and because "the strip search in this case came in the context of a forced entry into a residence" at about 10 P.M.[43] Good held that "the propriety of the strip search cannot be isolated from the context in which it took place," referring to the coerced entry into the home.[44]
 
 
 44
 The Tenth Circuit has likewise held that a police officer conducting a strip search of a small child in the context of a child abuse investigation lacked qualified immunity. Franz v. Lytle,[45] discussed above, held thata police officer who insisted on looking at a two year old's vagina, and having a doctor look at it, to assure the absence of sexual abuse, lacked qualified immunity for the strip search. The Tenth Circuit rejected the officer's arguments that there was no case directly in point establishing the unconstitutionality, that this was an administrative search, and that such great latitude should be allowed for child protection, and held that a tip that the baby was going around with urine soaked diapers and unsupervised was not sufficient reason to allow this search. The Tenth Circuit said that the social interest in child protection included not only protection against child abuse, but also "the child's psychological well-being, autonomy, and relationship to the family or caretaker setting."[46]
 
 
 45
 This case is like Good, not Darryl H. The strip search cannot be separated from the context in which it took place, the coerced entry into the home. An unlawful entry or search of a home does not end when the government officials walk across the threshold. It continues as they impose their will on the residents of the home in which they have no right to be. There is not much reason to be concerned with the privacy and dignity of the three year old whose buttocks were exposed, because with children of that age ordinarily among the parental tasks is teaching them when they are not supposed to expose their buttocks. But there is a very substantial interest, which forcing the mother to pull the child's pants down invaded, in the mother's dignity and authority in relation to her own children in her own home. The strip search as well as the entry stripped the mother of this authority and dignity. The reasonable expectation of privacy of individuals in their homes includes the interests of both parents and children in not having government officials coerce entry in violation of the Fourth Amendment and humiliate the parents in front of the children. An essential aspect of the privacy of the home is the parent's and the child's interest in the privacy of their relationship with each other.
 
 
 46
 The social worker had already established that, as against the weak tip, "no, Daddy, no," and "no, no, no," the children did not appear to be neglected or abused, the twelve year old said that they were not, and the object with which they were disciplined was a token "rod" consisting of a nine inch Lincoln log. By the time the social worker forced the mother to pull down the child's pants, the investigation had contracted to the social worker's personal opinion that any discipline of a child with an object must be against the law, and her puzzling mention of the family's religiosity. The government's interest in the welfare of children embraces not only protecting children from physical abuse, but also protecting children's interest in the privacy and dignity of their homes and in the lawfully exercised authority of their parents.
 
 
 47
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Act Up!/Portland v. Bagley, 988 F.2d 868, 870 (9th Cir. 1993).
 
 
 [2]
 Liston v. County of Riverside , 120 F.3d 965, 977 (9th Cir. 1997).
 
 
 [3]
 Act Up!/Portland, 988 F.2d at 871.
 
 
 [4]
 Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).
 
 
 [5]
 Anderson v. Creighton, 483 U.S. 635, 640 (1987) (internal citation omitted).
 
 
 [6]
 Id. at 641.
 
 
 [7]
 Brady v. Gebbie, 859 F.2d 1543, 1557 (9th Cir. 1988).
 
 
 [8]
 Anderson, 483 U.S. at 640-41.
 
 
 [9]
 White v. Pierce County, 797 F.2d 812 (9th Cir. 1986).
 
 
 [10]
 Id. at 815.
 
 
 [11]
 Anderson, 483 U.S. at 640.
 
 
 [12]
 White, 797 F.2d at 815.
 
 
 [13]
 Baker v. Racansky, 887 F.2d 183 (9th Cir. 1989).
 
 
 [14]
 Id. at 187.
 
 
 [15]
 Id. at 189.
 
 
 [16]
 Darryl H. v. Coler, 801 F.2d 893 (7th Cir. 1986).
 
 
 [17]
 Wildauer v. Frederick County , 993 F.2d 369 (4th Cir. 1993).
 
 
 [18]
 Franz v. Lytle, 997 F.2d 784 (10th Cir. 1993).
 
 
 [19]
 See Garcia v. Miera, 817 F.2d 650, 658 (10th Cir. 1987).
 
 
 [20]
 Franz v. Lytle. 997 F.2d 784 (10th Cir. 1993).
 
 
 [21]
 Good v. Dauphin County Social Servs., 891 F.2d 1087 (3d Cir. 1989).
 
 
 [22]
 Camara v. Municipal Court, 387 U.S. 523 (1967).
 
 
 [23]
 Wyman v. James, 400 U.S. 309 (1971).
 
 
 [24]
 Id. at 317.
 
 
 [25]
 New Jersey v. T.L.O., 469 U.S. 325 (1985).
 
 
 [26]
 T.L.O., 469 U.S. at 340.
 
 
 [27]
 White v. Pierce County, 797 F.2d 812, 815 (9th Cir. 1986).
 
 
 [28]
 Camara v. Municipal Court, 387 U.S. 523, 534, 539-40 (1967).
 
 
 [29]
 Los Angeles Police Protective League v. Gates, 907 F.2d 879, 884 (9th Cir. 1990).
 
 
 [30]
 Cal. Welfare & Inst. Code SS 16501(a) & 16208. Though appellants cite S 16208, the Code says that section was repealed.
 
 
 [31]
 DSS Regulations SS 31-105.1, 31.105.11, 31.120.1, 31-125.2, & 31130.2.
 
 
 [32]
 Cal. Admin. Code tit. 11, S 930.60.
 
 
 [33]
 Darryl H. v. Coler, 801 F.2d 893 (7th Cir. 1986).
 
 
 [34]
 Marx v. Loral Corp., 87 F.3d 1049, 1055 (9th Cir. 1996) ("Generally, an appellate court will not consider arguments not first raised before the district court unless there were exceptional circumstances.") (citation omitted).
 
 
 [35]
 Darryl H., 801 F.2d at 901.
 
 
 [36]
 Id. at 905.
 
 
 [37]
 Id.
 
 
 [38]
 Cal. Penal Code, tit. 1, SS 11165.3 & 11165.4.
 
 
 [39]
 Good v. Dauphin County Social Services, 891 F.2d 1087 (3d Cir. 1989).
 
 
 [40]
 Id. at 1092.
 
 
 [41]
 Id. at 1093, citing Doe v. Renfrow, 631 F.2d 91, 92-93 (7th Cir. 1980).
 
 
 [42]
 Good, 891 F.2d at 1094.
 
 
 [43]
 Id. at 1096.
 
 
 [44]
 Id. at 1096, n. 6.
 
 
 [45]
 Franz v. Lytle, 997 F.2d 784 (10th Cir. 1993).
 
 
 [46]
 Id. at 792-93.