Thomas ROGERS, an individual, Nicole Rogers, an individual and in her capacity as Guardian ad litem for Thomas R. Rogers, a minor and Shelby Rogers, a minor, Plaintiffs,

v.

COUNTY OF SAN JOAQUIN HUMAN SERVICES AGENCY; City of Lodi and Officer Dennis Lewis, et al., Defendants.

No. CIV–S–02–1961 DFLJFM.

United States District Court,
E.D. California.

Dec. 10, 2004.

David J. Beauvais, Esq., Berkeley, CA, for Plaintiffs.

Donald Stephen Schwabauer, City of Lodi Attorney's Office, Lodi, Paul W. Tozer, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, CA, for Defendants (City of Lodi).

Daniel Carl Cederborg, Office of the County Counsel, County of San Joaquin, Stockton, CA, for Defendants (County of San Joaquin, Charlotta Royal and Denise West).

## MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

On September 7, 2001, defendants Charlotta Royal of the County of San Joaquin Human Services Agency and Officer Dennis Lewis of the City of Lodi Police Department entered and searched the home of plaintiffs, Thomas and Nicole Rogers, to investigate an anonymous tip of child abuse and neglect. No search warrant had been obtained. After searching the residence and examining the children, Royal and Lewis decided to take custody of plaintiffs' two children, Shelby and Thomas Jr. ("Tommy"). Plaintiffs brought this action under 42 U.S.C. § 1983 challenging both the search and the removal of the children. All parties have made cross-motions for summary judgment. For the reasons stated below, plaintiffs' motion is DENIED and defendants' motions are GRANTED in part and DENIED in part.[1]

### I.

#### A. The Entry and Search

On the 20th and 23rd of August 2001, the San Joaquin County Child Protective

---

1. In the complaint, plaintiffs name the County of San Joaquin Human Services Agency ("the County") and one of its officers, Denise West, as defendants. Plaintiffs do not oppose the dismissal of the County and West; therefore, those defendants are DISMISSED.

Services ("CPS") received two phone "referrals" reporting the abuse and neglect of Tommy, age 5, and Shelby, age 3. (County's SUF ¶¶ 1–4.) The caller or callers, reporting essentially the same facts, said that the children were kept locked in their rooms at night and in a room at their parents' work during the day, had no medical or dental insurance, received no medical care, and were not toilet-trained. (*Id.;* Forrest Decl. ¶ 7, Ex. A.) It was further reported that Tommy had bottle rot and "no teeth," Shelby's hair was falling out, there were unsecured guns in the home, the kitchen contained maggots, and one of the children had found a dead mouse. (*Id.*) Finally, the caller or callers alleged that Thomas Rogers punched Tommy as a form of punishment and that both parents called the children "stupid." (*Id.*)

Once the August 23 referral was received, the earlier August 20 referral was "evaluated out"—meaning no response was required—because it was determined that the two referrals were duplicates.[2] (Forrest Decl. ¶ 8.) CPS classified the August 23 referral as a "10–day response," meaning that the facts reported did not present an "immediate emergency situation." (*Id.;* County's Mot. at 4 n. 2.) Under a "10–day response" referral, a child protective social worker was required to investigate within ten days of the August 23rd referral. (*Id.*)

CPS social worker Royal was assigned to the case on August 23, 2001. (County's SUF ¶ 5.) Royal first visited plaintiffs' residence on August 31, 2001, but no one was home. (*Id.*) On September 7, 2001, Royal again visited plaintiffs' residence. (*Id.* ¶ 6.) According to Royal, this time she requested backup from Lodi City police officers because of the reference to guns in the referral. (*Id.;* Royal 9/1/2004 Decl. ¶ 8.) When Lewis and the other officers

arrived at the home, Royal read Lewis the allegations in the referral. (County's SUF ¶ 7.) Lewis knocked on the door and called out, "Lodi P.D. Open the door." (Pls.' SUF ¶ 5.)

At this point, the parties' versions of the entry and search sharply differ. According to Lewis, after he knocked, Nicole Rogers partly opened the door, and the two talked. (Tozer Decl. Ex. E at 36–37.) Lewis further asserts that once he informed Nicole that he and Royal were there to perform a welfare check on the children, Nicole opened the door wider and stepped back, as if to consent to their entry. (*Id.* at 38.) By contrast, Nicole contends that when she unlatched the door and turned the knob, the door was pushed in on her so hard that she had to step back to avoid getting hit by it. (*Id.* Ex. A at 11–12.) According to Nicole, Lewis entered the house immediately thereafter. (*Id.*) She agrees that she had a conversation with Lewis, but only after he was inside the home. (*Id.* at 12.)

In addition to Nicole, Thomas Rogers was also at home, as were their two children. Royal and Lewis directed the Rogers family to remain in the living room while the officers first performed a security sweep of the home for the guns. (*Id.* at 21–24.) Plaintiffs assert that defendants never asked if they could search the house. (Pls.' SUF ¶ 19; County's Opp'n SUF ¶ 5.) However, defendants argue that plaintiffs' actions implied their consent to the search of their home as part of a child welfare investigation. In particular, according to defendants, when asked where the rest of her family was, Nicole proceeded to go to the various bedrooms, followed by defendants. (City's Opp'n SUF ¶ 8.) Also, plaintiffs directed defendants to certain areas of

---

**2.** All parties treat the two referrals as one, apparently assuming that the referrals were made by the same informant.

the house in response to defendants' inquiries, such as to point out the locations of the guns. (*Id.;* Tozer Decl. Ex. A at 21–23.) Finally, defendants assert that plaintiffs seemed willing to cooperate with the investigation; for example, plaintiffs retrieved information such as medical cards and generally answered defendants' questions. (County's Reply at 4.)

## B. The Removal

During the search of the plaintiffs' home, defendants observed what they believed to be signs of medical neglect of the two children. It is undisputed that on the day of the removal, both children had pale faces, Shelby had thinning hair, and Tommy suffered from bottle rot and had several missing teeth. (Pls.' Resp. to County's SUF ¶¶ 23–25; City's Opp'n SUF ¶ 207.) In her deposition, Nicole described Tommy's teeth as "horrible." (Pls.' SUF ¶ 24.) After questioning plaintiffs about Tommy's condition, defendants learned that plaintiffs had cancelled a dental appointment to correct the decay out of fear of the required dental procedure, although plaintiffs contend that they had rescheduled the appointment. (*Id.* ¶¶ 22–23, 108.)

The search of the home turned up other evidence corroborating the allegations in the referral. Plaintiffs concede that there were guns in the home, the house was messy, and the family had no medical insurance. (*Id.* ¶¶ 15, 37, 44–46.) There were also locks on the outside of the children's bedroom doors, although plaintiffs deny that they were locking the children in their rooms. (*Id.* ¶¶ 10–12.) Both children were wearing diapers, including 5 year old Tommy, who was wearing a pull-up diaper. (Pls.' Resp. to County's SUF ¶ 20.) Also, it is undisputed that both children had bruising on their legs. (Royal 9/1/2004 Decl. ¶ 20.) Finally, defendants confirmed that plaintiffs took Tommy and Shelby with them three to five days a week to their automobile shop in another

county. (County's SUF ¶ 36.) Based on the totality of these facts, Royal and Lewis agreed that the children should be removed, although the exact factors that contributed to this decision are disputed. (*Id.* ¶ 37.)

Royal took the children directly to Lodi Memorial Hospital, where the hospital report confirmed that the children's hygiene was "poor," that Tommy had "many teeth out," and that Shelby's hair was "sparse, brittle." (City's Opp'n SUF ¶¶ 207–08.) After their examinations, Royal then took the children to a children's center and filled out a "CPS Intake Assessment Referral to the CPS Juvenile Court" in which she detailed her observations at plaintiffs' home on September 7. (County's Reply at 9.) Thereafter, Royal and Lewis had no further involvement with the case.

## II.

■ Defendants Lewis and Royal assert that they are entitled to qualified immunity for the entry and search of plaintiffs' home and the removal of the children. In deciding a claim of immunity, the court must first decide if a constitutional right has been violated on the plaintiffs' alleged facts. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, the court must then decide whether this right was clearly established at the time of the unconstitutional conduct. *Id.* A right is "clearly established" if "a reasonable official would understand that what he is doing violates that right." *Id.* at 202, 121 S.Ct. 2151 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

■ In cases such as this, when the constitutional violation depends on an "objective reasonableness" standard similar to that used to establish qualified immunity, the constitutional and qualified immunity

questions become enmeshed. *See id.* at 199–200, 121 S.Ct. 2151. However, the Court has cautioned against conflating the two inquires. While the first portion of the inquiry looks to the facts and circumstances known to the officer and asks whether the officer's conduct was reasonable, the second portion of the inquiry looks to whether the conduct was clearly unlawful under case law specifically directed to the kind of situation and facts confronted by the officer. *Id.* at 201, 121 S.Ct. 2151. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. If the officer makes a reasonable mistake as to what the law requires in a particular set of facts and circumstances, the officer is entitled to the protection of qualified immunity. *Id.* at 205, 121 S.Ct. 2151. In short, the law must be sufficiently clear and developed, that the officer is on notice that his conduct, in the particular circumstances confronted, is unlawful. *Id.* at 206, 121 S.Ct. 2151 ("Qualified immunity operates ... to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.").

## A. Entry and Search of Home

All parties agree that defendants did not have a warrant to enter and search plaintiffs' home. Warrantless searches are per se unreasonable, except in a "few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Lewis and Royal contend that they are entitled to qualified immunity because they reasonably believed that they had plaintiffs' consent to enter and search the home or, if not, because they reasonably believed that there were exigent circumstances justifying entry without a warrant or consent.

### 1. Consent

██ The conflicting accounts of the entry and search preclude a finding of consent. Moreover, under plaintiffs' version of the facts, the officers would not be entitled to qualified immunity. Under defendants' version of events, a jury could find that defendants had consent to enter and search the home. Nicole's affirmative act of opening the door wider and stepping back, after Lewis explained his purpose for being there, could be interpreted as an invitation to enter and perform the welfare check on the home. *See United States v. Griffin,* 530 F.2d 739, 743 (7th Cir.1976) (implying consent when police knocked on the door, the occupant opened it, police requested to be admitted, and the occupant left the door open and stepped back into the apartment). Consent to search the home could be further implied from plaintiffs' cooperative actions described above, coupled with the lack of an expressed objection to the search. *See United States v. Shaibu,* 920 F.2d 1423, 1427 (9th Cir.1990) (noting that consent to enter may be implied from affirmative acts "responding to a police request"); *United States v. Mejia,* 953 F.2d 461, 466 (9th Cir.1991) (implying consent to enter and search defendant's bedroom when defendant's wife consented to entry into the home, the officers asked who else was home, and the wife failed to object when the officers followed her to the bedroom).

██ Under Nicole's version, however, there was no consent and Royal and Lewis would not be entitled to qualified immunity. According to Nicole, Lewis did not request to enter and she did not commit some affirmative act to indicate consent to entry. The Ninth Circuit in *Shaibu* specifically held that in the absence of an affirmative request by an officer to enter a home, consent could not be inferred simply from the act of retreating back into a

home. 920 F.2d at 1426, 1428. Here, if Lewis pushed the door in and, directly thereafter, stepped inside, a constitutional violation would be alleged and no reasonable official could have thought that he had consent to enter. The law is clearly established that an officer, including a social worker, cannot push his way into a home without a warrant or consent.[3]

Furthermore, after any entry without consent, no reasonable official could have thought that plaintiffs' subsequent actions implied consent to search. In these circumstances, it would be clear to a reasonable official that plaintiffs were merely acceding to defendants' demands. Such a "submission to a claim of lawful authority" cannot provide "legally effective consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 233, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Good v. Dauphin County Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1095 (3d Cir.1989); *see also Shaibu*, 920 F.2d at 1426 ("Judicial concern to protect the sanctity of the home is so elevated that free and voluntary consent cannot be found by a showing of mere acquiescence to a claim of lawful authority." (citing *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968))).

The facts in dispute are central to the issue of qualified immunity for the entry and search based on consent. Therefore, defendants' qualified immunity motions are DENIED to the extent the motions are based upon plaintiffs' consent to the entry and search. Plaintiffs' motion for summary judgment on the constitutionality of the entry and search is also DENIED.

### 2. Exigent Circumstances

■ Lewis argues alternatively that even if he did not have consent, the entry and search was justified by exigent circumstances. Exigent circumstances may justify a warrantless search where officers possess information suggesting "that life or limb is in immediate jeopardy." *Good*, 891 F.2d at 1094. This general standard for warrantless entry in exigent circumstances has been consistently applied in the child welfare context. *See id.* (finding that "the principles developed in the emergency [entry] cases" apply equally when harm to children is involved); *Calabretta*, 189 F.3d at 813–14 (same); *White v. Pierce County*, 797 F.2d 812, 815 (9th Cir.1986) (holding in a child welfare investigation case that "it was settled constitutional law that, absent exigent circumstances, police could not enter a dwelling without a warrant"). As set forth below, Lewis was guided by clearly established law demonstrating the absence of exigent circumstances when he entered and searched plaintiffs' home without a warrant.[4]

■ Based on the information available at the time of the entry and search of plaintiffs' home, a reasonable officer would have known that exigent circumstances were not present. The referral was some two weeks old. The CPS already had found that the information contained in the report did not present an emergency situation. Defendants obtained no further information suggesting that conditions were urgent. Furthermore, Royal herself did not perceive an immediate danger to the children, as shown by both her seven-day

---

**3.** Social workers are held to the same fourth amendment standards as police officers. *See Walsh v. Erie County Dep't of Job & Family Servs.*, 240 F.Supp.2d 731, 746–47 (N.D.Ohio 2003) ("There is ... no social worker exception to the strictures of the Fourth Amendment." (citing *Calabretta v. Floyd*, 189 F.3d 808, 816 (9th Cir.1999))).

**4.** Lewis's argument that the general exigent circumstances test was not "clearly established" because it had not been applied in the child welfare context is directly contradicted by *White* and *Calabretta*.

delay in making her first unsuccessful attempt to investigate and her further seven-day delay in returning to the home.[5] *See Calabretta*, 189 F.3d at 813–14 (finding no qualified immunity for a warrantless entry to investigate child abuse partly because officials waited 14 days after abuse was reported before forcing entry).

Moreover, the only information the officials had was contained in an anonymous referral. In the absence of grave and detailed allegations, an anonymous tip generally may not furnish the requisite exigency to enter and search without a warrant. *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Although the referral did allege physical abuse—the punching for punishment—it did not indicate the frequency of this conduct, much less its immanency. The other allegations, such as the thinning hair and tooth decay, were either similarly nonthreatening or had possible innocent explanations. Also, there was no indication of the reliability of the caller, such as would be furnished through corroborating evidence. *See White*, 797 F.2d at 815–16 (anonymous tip that child had severe welts on his back furnished exigent circumstances to enter when the father acted violently towards the investigating officers and hid the child's back from view). In short, no reasonable official could have thought that the information in the anonymous report alone furnished cause to believe that immediate entry was necessary to protect the children from an imminent threat of bodily injury.

■ Lewis argues that because he was not informed of either the classification or date of the referral, it was reasonable for him to think that the children were in danger of immediate harm. (City's Reply at 28–29.) However, "where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 772 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983); *see also BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir.1986) ("A police officer may not close her or his eyes to facts·that would help clarify the circumstances of an arrest."). It was up to Lewis to determine the date of the referral before entering the house without a warrant. Furthermore, even without the delay, the substance of the referral did not furnish an adequate basis for entering the house on the basis of exigent circumstances. Accordingly, Officer Lewis's qualified immunity motion on the basis of exigent circumstances is DENIED.

### B. Removal of the Children

Plaintiffs also challenge defendants' decision to remove Tommy and Shelby from their home without the procedures guaranteed by the Fourth and Fourteenth Amendments.[6] Defendants argue that the removal of the children was justified by an emergency. Alternatively, even if the children were not in immediate danger, defendants contend that they are nevertheless entitled to qualified immunity for the removal because the law was not clearly established as·to when children with possi-

---

**5.** Royal testified that she requested police backup because of the allegations of guns in the home and that she thought Lewis was there to "keep the peace." (City's Opp'n SUF ¶¶ 127, 130.) This suggests that Royal feared for *her* safety during a search, not that of the children. *See Calabretta*, 189 F.3d at 813.

**6.** Because "the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children," the analysis of the parents' due process claims applies equally to the children's Fourth Amendment wrongful seizure claims. *Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126, 1137 n. 8 (9th Cir.2000).

bly serious medical problems may be removed from their parents without a court order.

### 1. Constitutional Violation

Under *Saucier,* the first step in the qualified immunity analysis is to ask whether, accepting plaintiffs' alleged facts, the officers' conduct violated the Constitution. On the facts alleged by plaintiffs, as well as the undisputed facts, the court finds that there was a constitutional violation; however, as will be discussed in the following section, the court further finds that the law was not clearly established in the context of a situation presenting evidence of medical neglect and possibly serious medical conditions.

■ "The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies." *Mabe v. San Bernardino County,* 237 F.3d 1101, 1107 (9th Cir.2001). In order to adequately protect the integrity of the family, the emergency removal doctrine applies only upon "a showing of true necessity—that is, an imminent and substantial threat to life, health, or property." *People v. Smith,* 7 Cal.3d 282, 286, 101 Cal.Rptr. 893, 496 P.2d 1261 (1972). Under this "very limited exception," *Mabe,* 237 F.3d at 1110, before taking the extreme measure of removing a child without a court order or other procedure, an official must consider not only the severity of the threat to the child but also whether the harm is so imminent that no delay can be countenanced. *See id.* at 1108 (finding no justification for the removal of a child believed to be sexually abused in the past in light of the lack of harm that would have been caused by "the further delay of a few hours necessary to obtain the warrant").

■ As a general proposition, officials may remove children without a court order only if two conditions are present. First,

the officers must "possess information at the time of seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury." *Id.* at 1106 (quotations omitted). And second, even if the child is in imminent danger of serious bodily injury, the officers must also have reasonable cause to believe "that the scope of the intrusion is reasonably necessary to avert that specific injury." *Id.*

The courts have applied the imminent serious bodily injury test in settings in which physical or sexual abuse of children by their parents is suspected. The question then becomes whether the evidence supports an officer's conclusion that another instance of abuse is so likely and imminent that immediate removal is appropriate. Medical neglect situations present different issues. In these situations, the affirmative conduct of the parents is not the focus; rather, it is the parents' failure to act and the child's medical status that is critical. And while the law may expect officers to apply commonsense, training and experience to situations involving discrete acts of abusive conduct, in situations involving medical neglect the officers must make a medical evaluation, something that they are ill equipped to do, particularly in the setting of a removal.

■ In the situation of medical neglect, the court now holds that the serious bodily injury test requires officials to have reasonable cause to believe both that the neglect has resulted or imminently will result in a possibly serious medical condition and that immediate removal is necessary to avert this condition, such that a court order cannot first be obtained. A serious medical condition is one that is life threatening, could cause lasting damage that could be disabling, or that causes significant pain even if no lasting injury. The court further holds that a removal

without a court order violates the Fourteenth Amendment when the officers act on the basis of (1) evidence of possible malnourishment without evidence of emaciation, listlessness, or other indications of a serious condition, and (2) evidence of serious tooth decay without evidence of significant pain or some other serious medical condition related to the tooth decay.

 Here, it is undisputed that Tommy had bottle rot and tooth decay and that Shelby had sparse hair, possibly as a result of neglect. However, before summarily removing them from their parents' custody, defendants must also have had reason to believe that the condition was causing significant pain or that some serious harm could occur to Tommy or Shelby if they were not immediately treated. Yet there was no evidence of significant pain or any other serious medical condition before Royal and Lewis.

Similarly, it is not enough that the officers believed that the children were malnourished; the officers must also have had a basis to believe that in the time it would take to get a warrant or provide a judicial procedure, the malnourishment would cause some lasting damage. Here, the children did not show signs of extreme malnourishment, such as listlessness or emaciation. Therefore, there was inadequate cause to believe that serious consequences would result from a short delay.

Defendants cite a myriad of other justifications for the removal of the children, all of which similarly fail. First, defendants focus on the allegation in the referral that Thomas Rogers punched the children for punishment. According to defendants, the abuse allegation became more reliable once the other allegations in the referral were seemingly confirmed. (County's Reply at 10; County's Mot. at 8.) However, there was no indication from the referral of when such punishment had occurred or would reoccur. During the investigation, Thomas Rogers showed no signs of violence and was entirely cooperative according to defendants' own accounts. Although the children had bruises on their legs, there is no indication that the bruising was abnormal, recent, or caused by Thomas. Royal admits that the evidence to support the punching allegation was "inconclusive." (County's Mot. at 8.) Without more evidence of the threat of imminent physical abuse, emergency removal was not justified on this ground, particularly in light of the delay that had already occurred after the referral.[7] *See Mabe,* 237 F.3d at 1108 (holding that removal was not proper, in spite of clear evidence of past sexual abuse, when there was no indication that "the child would be concealed or further abused during the time it would take to get a warrant").

Second, defendants were concerned that plaintiffs would flee to avoid supervision because plaintiffs traveled with the children out of the county every day to work. (County's Opp'n at 14.) However, there was no reason to expect that plaintiffs would flee their home—which they owned—particularly given that they were admittedly cooperative during the investigation. (Royal 9/1/2004 Decl. Ex. A at 2, 4.) There is no evidence that plaintiffs were getting ready to flee or would have been likely to do so in the short time it would take to get a court order.

---

7. Defendants also express concern that the children would not be in the presence of mandated reporters who could witness any possible abuse. (County's Opp'n at 14.) Without reasonable cause to believe that the children would be abused in the time it would take to get a warrant, however, the fear that the children would not have contact with mandated reporters could not justify immediate removal, particularly in view of the less than convincing evidence of physical abuse.

Third, defendants cite to a number of problems in plaintiffs' home; however, none of these problems justified the removal of the children. None of them presented an imminent hazard and all were correctable. For example, defendants could have instructed plaintiffs to remove the locks on the children's doors and take further steps to secure the guns, which had already been placed out of reach.

In sum, on the facts alleged by plaintiffs as well as the undisputed facts, the court finds that defendants did not have reasonable cause to believe that the apparent neglect of the two children had resulted or would result in a possibly serious medical condition and that immediate removal was necessary to avert a serious condition before a court order could be obtained. For these reasons, the immediate removal of the children violated the Fourteenth Amendment.

#### 2. Qualified Immunity

■ Although the removal of the children was not justified by an imminent threat, defendants are entitled to qualified immunity. Defendants' mistake in removing the children was not clearly unlawful in view of the dearth of case law guiding them in making their removal decision in such circumstances. *See Tenenbaum v. Williams*, 193 F.3d 581, 598 (2d Cir.1999) (granting qualified immunity for a removal based on the lack of case law specifically holding that the threatened harm is not immediate if there is "time safely to obtain judicial authorization").

Plaintiffs assert that because the "immediate danger of serious physical harm" test had been clearly and consistently applied in both physical and sexual abuse cases, their rights were clearly established. However, there was, and still is, an absence of case law applying this test in the context of medical neglect. In abuse cases the severity of the threatened abuse is usually not the issue; rather, the focus is on the likelihood and imminence of any reoccurrence of past abuse. The law is now clearly established that the officer must have reason to believe that immediate removal is necessary to avoid a reoccurrence of abuse. *See Wallis*, 202 F.3d at 1138–41 (focusing on the likelihood and imminence of the allegedly planned "sacrifice" of a child); *White*, 797 F.2d at 815–16 (entry case examining the evidence of past abuse and the imminence and likelihood of its reoccurrence); *Calabretta*, 189 F.3d at 813–14 (same); *Mabe*, 237 F.3d at 1107–08 (evidence of reoccurrence).

Medical neglect, on the other hand, is a continuing harm, which can result in serious medical conditions that may or may not require immediate medical treatment. Yet officers considering removing such a medically neglected child must evaluate the severity of the harm that the neglect has caused. This evaluation, which is essentially a medical determination, is unique to medical neglect cases and poses a difficult challenge for law enforcement and child welfare investigators. Officers are not medical experts and can only make reasonable decisions based on what they can observe. They do not have the opportunity, training, or authority to perform medical examinations on the spot. Determining the medical condition of vulnerable children is no simple matter, as any parent who has been to the emergency room with a young child can attest. For this reason, the Court's admonition in *Saucier* that the qualified immunity test should not be applied at a level of generality is especially apt. *See Saucier*, 533 U.S. at 201–09, 121 S.Ct. 2151. In order that officers—who are not medical professionals—may know whether particular medical situations are by law so serious as to merit an immediate removal, the case law must give adequate, specific guidance in the context of particular medical neglect situations. At the time

of the removal of the Rodgers' children, no case guided the officers on how to apply the serious bodily injury test for abuse in the context of medical neglect generally let alone in the context of possible malnourishment and severe tooth decay more specifically.

It is apparent that the defendants were quite concerned by the condition of the children and thought they should receive immediate medical attention. There were signs of malnourishment and, in the case of Tommy, of rampant tooth decay. Royal took the children from the home directly to the hospital. *See Calabretta,* 189 F.3d at 813 (declining to grant qualified immunity, but noting that "had the social worker or police officer been alarmed ... this would be a different case"). This conduct was not clearly unlawful.[8] The case law provided defendants with no guidance in making the removal decision. It is for the first time that the court directs officials in medical neglect cases to examine both the seriousness and imminence of a medical condition, including pain. And it is for the first time that the court holds that possible indications of malnourishment coupled with severe tooth decay do not justify removal without a court order.

It is exactly these kinds of decisions— made under difficult conditions and uncertain law—that qualified immunity is designed to protect. "[O]ne of the cardinal purposes of immunity is to offer the police 'a fairly wide zone of protection in close cases.'" *Veilleux v. Perschau,* 101 F.3d 1, 3 (1st Cir.1996) (quoting *Roy v. Inhabitants of Lewiston,* 42 F.3d 691, 695 (1st Cir.1994)). Officers faced with the deci-

sion to remove a child for medical neglect must be allowed a broad margin of error. *See Anderson,* 483 U.S. at 638, 107 S.Ct. 3034. For these reasons, defendants' qualified immunity motions relating to the removal of the children are GRANTED.

### C. Liability of the City of Lodi

▮ Finally, plaintiffs assert that the City of Lodi should be held liable for the allegedly unlawful removal and search. More specifically, plaintiffs argue that the City of Lodi failed to inform its officers of the specific legal requirements in emergency child welfare cases. (Pls.' Mot. at 17–18.) Municipal liability exists only if "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). A municipality may be liable for inadequate police training only "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. 1197.

▮ Plaintiffs first point out that Lodi police are not trained to be familiar with specific cases dealing with the removal of children or to know that removal is a "last resort." (Pls.' Mot. at 17.) However, plaintiffs offer no evidence, such as of the frequency of unconstitutional removals, showing that the City knew, or should have known, that a lack of this training was causing the unlawful removal of children. That the court finds that there is no case law guiding officials in the removal of

---

8. The uncertainty is further exacerbated by sections 305 and 306 of the California Welfare and Institutions Code, which reflect an attempt to codify the "imminent danger of serious bodily harm" test. *Moodian v. County of Alameda Soc. Servs. Agency,* 206 F.Supp.2d 1030, 1034 (N.D.Cal.2002). These statutes allow for the warrantless removal of a child in specified situations, including when "the minor has an immediate need for medical care." Cal. Welf. & Inst.Code §§ 305–306. A reasonable official could think that this statute authorizes removal any time a child is presently suffering from a medical condition requiring immediate attention whether or not the medical condition is severe.

children in medical neglect cases further undermines plaintiffs' assertion that the City of Lodi knowingly disregarded this law in training its officers. Moreover, even had there been training on medical neglect removals, there is no showing that such training should have anticipated the kind of situation confronted by defendants here, involving malnourishment and bottle rot. Thus, plaintiffs fail to show causation—that the lack of knowledge of specific case law on the removal of children contributed to the wrongs alleged. *See Doe v. Lebbos,* 348 F.3d 820, 831 (9th Cir.2003) (granting the County defendant summary judgment on plaintiffs' *Monell* claim based on the lack of evidence that the failure to train its social workers "deliberately caused a deprivation of [plaintiffs'] constitutional rights").

Furthermore, the evidence shows that Lodi officers are trained in the proper removal standard at a general level. (Pls.' SUF ¶¶ 177–78; City's Opp'n SUF ¶¶ 98–100.) The fact that the police are not trained to remove children except as a "last resort" proves nothing since this ambiguous formulation is not part of the serious bodily injury test.

Plaintiffs do not carry their burden of showing deliberate indifference on the part of the City of Lodi, and summary adjudication is granted to the City on this claim.

### III.

Plaintiffs' motion for summary judgment is DENIED in full. Defendant Royal and Lewis's qualified immunity motions on plaintiffs' § 1983 claims based on the removal of Tommy and Shelby are GRANTED. The City of Lodi's motion for summary judgment on plaintiffs' *Monell* claim is GRANTED. Because material facts are in dispute over the issue of consent, defendants' motions for summary judgment on plaintiffs' § 1983 claims based on the entry and search are DENIED. Finally, because plaintiffs do not oppose the dismissal of the County and Ms. West, those defendants are DISMISSED.

IT IS SO ORDERED.