**Kelly PHANEUF, Plaintiff–Appellant,**

v.

**Dorene M. FRAIKIN, Kathleen Binkowski, Plainville Bd. of Ed., Town of Plainville and Rosemarie Cipriano, Defendants–Appellees.**

Docket No. 04–4783–CV.

United States Court of Appeals, Second Circuit.

Argued: July 11, 2005.

Decided: May 19, 2006.

John M. Gesmonde, Gesmonde, Pietrosimone, Sgrignari & Pinkus, LLC, Hamden, CT, for Plaintiff–Appellant.

Michael F. O'Connor, Williams, Walsh & O'Connor, North Haven, CT, for Defendant–Appellees.

Before: JACOBS, B.D. PARKER, Circuit Judges, and HURD, District Judge.*

B.D. PARKER, JR., Circuit Judge.

Kelly Phaneuf, a former high school student in Plainville, Connecticut, appeals from a judgment of the United States District Court for the District of Connecticut (Alfred V. Covello, *J.*) granting Appellees summary judgment on her claim under 42 U.S.C. § 1983 that her Fourth Amendment rights were violated when she was strip searched by school officials. Because we conclude that the strip search was not justified at its inception, and therefore was unreasonable under the attendant circumstances, we vacate the judgment and remand for further proceedings.

## BACKGROUND

We draw the pertinent facts primarily from the opinion of the district court. *See Phaneuf v. Cipriano,* 330 F.Supp.2d 74, 75–76 (D.Conn.2004). Except as noted, they are undisputed.

On June 7, 2002, the seniors at Plainville High School were scheduled to attend their senior class picnic at an off-campus location. Prior to their departure, school

---

* The Honorable David N. Hurd of the United States District Court for the Northern District of New York, sitting by designation.

officials performed a pre-announced search of all students' bags for security purposes. This search revealed a package of cigarettes in Phaneuf's purse. She was legally entitled to possess them since she was over the age of eighteen, but school regulations prohibited the possession of cigarettes by students on school grounds.

A student named Michele Cyr reported to Cindy Birdsall, a physical education teacher, that Phaneuf told her and other students that she possessed marijuana.[1] According to Cyr, Phaneuf told her that she planned to hide the marijuana "down her pants" during the mandatory bag check. After receiving this information from Cyr, Birdsall reported the statement to the principal, Defendant–Appellee Rose Marie Cipriano.[2] Birdsall believed Cyr to be trustworthy, however the record does not reveal why Birdsall held this belief. Cipriano considered Cyr's report reliable because Cyr at some point worked closely with the school's staff as an office aid, though the record is unclear on the precise timing of when Cipriano held this belief. The clearest statement of what Cipriano knew about the tip prior to the search comes from Cipriano's affidavit, in which she attested that "it was brought to [her] attention by a physical education teacher at Plainville High School Cindy Birdsall that a reliable student had informed her that Kelly Phaneuf had marijuana down

her pants ...." This does not indicate whether Cipriano knew who the "reliable student" was prior to the search. Though she testified at her deposition that Birdsall told her the names of the four students who allegedly heard Phaneuf's statement prior to the search, Cipriano also testified at her deposition that she could not remember the names of the students after the search, and had to be reminded of Cyr's name in particular, after the picnic.

Cipriano boarded the bus on which Phaneuf sat, and asked her to disembark. Cipriano and Birdsall led Phaneuf to the nurse's office, explaining to her that a fellow classmate had informed them that she possessed marijuana. Phaneuf denied the allegation, but, according to the affidavit testimony of Cipriano and Birdsall, did so "in a manner that made both Cipriano and Birdsall believe she was lying." *Phaneuf*, 330 F.Supp.2d at 76. Neither Cipriano nor Birdsall testified as to what particular aspect of the denial made it suspicious. Phaneuf had a history of disciplinary problems, though none involved drug possession.

Once at the nurse's office, Cipriano instructed the school's substitute nurse, Defendant–Appellee Dorene Fraikin, to conduct a search of Phaneuf's underpants. Cipriano ordered nurse Fraikin to "open and check" that area. *Id.* When nurse

---

1. Though the district court found that it was undisputed that Cyr was the only student who reported Phaneuf's statement to Birdsall, the record is unclear whether a group of students or Cyr alone informed Birdsall of Phaneuf's statement.

2. Though the district court believed this fact to be undisputed, the record on this point is a bit confused. Cyr's affidavit indicates that she personally went with Birdsall to Cipriano's office and reported this information to both Birdsall and Cipriano, but this is not corroborated by either Birdsall or Cipriano's affidavits, or Cipriano's deposition. In re-

sponse to Defendant–Appellees' District of Connecticut Local Rule 56(a)(1) Statement of undisputed facts, Phaneuf specifically admitted that "Cyr had informed defendants Cindy Birdsall *and* Roas [*sic*] Marie Cipriano that Kelly Phaneuf indicated that she had marijuana and was going to put it down her pants to avoid the bag checks taking place in the auditorium." (Emphasis added). This discrepancy is potentially important insofar as it pertains to the degree of Cipriano's personal, direct contact with the informant, Cyr, prior to the decision to conduct the strip search of Phaneuf.

Fraikin expressed apprehension about conducting the strip search herself, Fraikin and Cipriano called Phaneuf's mother, Lisa Phaneuf, and asked her to come to the school to conduct the search. While waiting for Phaneuf's mother to arrive, Cipriano searched Phaneuf's purse, and found cigarettes and a lighter. As previously noted, possession of these items on school grounds violated school rules.

According to her affidavit testimony, when Phaneuf's mother arrived at the school she expressed objections to the search but was told that if she refused to participate in the search, school officials would call the police. At that point she, Fraikin and Phaneuf went into a small room within the nurse's office. Phaneuf's mother conducted the search, while Fraikin stood behind her. A closed curtain separated the doorway of the room from the common area of the nurse's office. Phaneuf first raised her shirt and pulled down her bra to show that nothing was concealed there.[3] Phaneuf then dropped her skirt to the floor, around her ankles. Phaneuf's mother asked Fraikin if this was enough, and Fraikin answered that it was not. Phaneuf then pulled her underpants away from her body and turned around so that her mother could view her buttocks. The parties dispute whether Fraikin watched the search. Fraikin maintains that her back was turned to Phaneuf and her mother throughout the search while Phaneuf contends that Fraikin watched. Phaneuf avers that she was "extremely upset and anxious before, during and after the search, to the point of being hysterical." The search did not reveal marijuana. Immediately following the search, Phaneuf's mother drove her daughter home,

but later drove her back to school. Cipriano then gave Phaneuf a ride to the picnic.

Phaneuf then brought suit in Connecticut Superior Court, alleging that her Fourth Amendment and various state law rights were violated when she was subjected to the strip search. The school officials removed the case to the District of Connecticut, and, following discovery, moved for summary judgment on the grounds that the strip search was reasonable and that they were entitled to qualified immunity.

The district court held that the search was reasonable under the standard articulated by the Supreme Court in *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). *See Phaneuf*, 330 F.Supp.2d at 75, 77. The district court noted that "a strip search of a student by public school administrators is subject to higher scrutiny than a search of a student's possessions." *Id.* at 78. However, the court found that, as required by *T.L.O.*, the search was both "reasonable at its inception" and "reasonable in scope." *Id.* at 80, 82.

The district court employed a two-step approach in reaching this conclusion. First, the court found that the school officials had reasonable suspicion to re-check Phaneuf's purse because they had a "tip from a reliable student," Phaneuf had "past disciplinary problems," and Cipriano and Birdsall were "suspicious" of the manner in which Phaneuf denied the accusation she possessed marijuana. *Id.* at 80. Second, the district court then found that the discovery of the cigarettes and lighter in Phaneuf's purse created a "higher level

---

**3.** Though the parties disputed whether the search of Phaneuf's bra was ordered by Fraikin or was voluntary, the district court found that Phaneuf voluntarily lifted her shirt and pulled down her bra. *See Phaneuf*, 330

F.Supp.2d at 82. Disputed issues of fact should not be resolved on summary judgment, so this Court will assume that the search of Phaneuf's bra was not voluntary.

of suspicion that [Phaneuf] could also be carrying contraband on her person," which, in turn, "justified the extended level of intrusion necessary to conduct a search of Kelly Phaneuf's person for evidence of drug possession in school." *Id.*

The district court concluded the strip search was reasonable in scope because it was not excessively intrusive in light of the age and sex of Phaneuf, and the nature of the infraction. Specifically, the district court noted that the strip search was conducted in the relative privacy of Fraikin's office, and only involved women, including Phaneuf's mother. Furthermore, the district court held that the search was "reasonably related to the objectives of the search," because of Cyr's allegation that Phaneuf said that she had hid the marijuana in her underwear. *Phaneuf,* 330 F.Supp.2d at 82 (internal quotation marks omitted). Finally, the district court noted that "the nature of the suspected infraction justified the search" because drugs are " 'a pressing concern in every school.' " *Id.* (quoting *Bd. of Educ. v. Earls,* 536 U.S. 822, 834, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002)); *see also Beard v. Whitmore Lake Sch. Dist.,* 402 F.3d 598, 605 (6th Cir.2005) ("[A] search undertaken to find money serves a less weighty governmental interest than a search undertaken for items that pose a threat to the health or safety of students, such as drugs or weapons.").

Because the district court dismissed Phaneuf's Fourth Amendment claims, it did not reach the question of whether the individual defendants were entitled to qualified immunity. *Phaneuf,* 330 F.Supp.2d at 82–83. The district court then dismissed Phaneuf's state law claims without prejudice. *Id.* at 83. This appeal followed.

## DISCUSSION

We review a district court's grant of summary judgment *de novo,* drawing all factual inferences in favor of the non-moving party. *De La Mota v. U.S. Dep't of Educ.,* 412 F.3d 71, 77 (2d Cir.2005); *Coon v. Town of Springfield,* 404 F.3d 683, 685 (2d Cir.2005). "The Court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (internal quotation marks omitted).

### I.

■ The essential purpose of the Fourth Amendment is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, in order to safeguard individual privacy against arbitrary governmental intrusions. *See Delaware v. Prouse,* 440 U.S. 648, 653–54, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In *New Jersey v. T.L.O., supra,* the Supreme Court applied the Fourth Amendment "reasonableness" standard to a search of a student by school administrators. In so doing, the Court attempted to strike a balance between "the schoolchild's legitimate expectations of privacy" and the "substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds." 469 U.S. at 340, 339, 105 S.Ct. 733. Ultimately, the Court concluded that:

the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the

legality of a search of a student should depend simply on the *reasonableness, under all the circumstances,* of the search.

*Id.* at 341, 105 S.Ct. 733 (emphasis added). Although *T.L.O.* involved the search of a student's purse, not a strip search, we join our sister circuits in concluding that *T.L.O.*'s flexible "reasonableness" standard governs our review of a strip search. *See, e.g., Hedges v. Musco,* 204 F.3d 109, 116–17 (3d Cir.2000); *Jenkins by Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821, 824 (11th Cir.1997) (en banc); *Cornfield by Lewis v. Consol. High Sch. Dist.,* 991 F.2d 1316, 1320–21 (7th Cir.1993); *Williams by Williams v. Ellington,* 936 F.2d 881, 884 (6th Cir.1991).[4]

■ *T.L.O.* articulated a two-part test to determine the reasonableness of a student search. First, the search must be " 'justified at its inception.' " *T.L.O.,* 469 U.S. at 341, 105 S.Ct. 733 (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). According to the Court, "[u]nder ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are *reasonable grounds for suspecting* that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.,* 469 U.S. at 341–42, 105 S.Ct. 733 (emphasis added) (footnote omitted); *see Cornfield,* 991 F.2d at 1320 ("[A] search is warranted only if the student's conduct creates a reasonable suspicion that a particular regulation or law has been violated, with the search serving to produce evidence of that violation."); *Williams,* 936 F.2d at 881 (The Supreme Court "formulat[ed] a reasonable suspicion standard for the protection of a student's fourth amendment rights."). The requirement of reasonable suspicion is not a requirement of absolute certainty but only of sufficient probability. *See T.L.O.,* 469 U.S. at 346, 105 S.Ct. 733.

Second, the student strip search must be " 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *Id.* at 341, 105 S.Ct. 733 (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. 1868). A search will be "permissible in its scope" when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.,* 469 U.S. at 342, 105 S.Ct. 733.

## II.

■ Although *T.L.O.* held that reasonable suspicion is the governing standard, the reasonableness of the suspicion is informed by the very intrusive nature of a strip search, *N.G. v. Connecticut,* 382 F.3d 225, 234 (2d Cir.2004), requiring for its justification a high level of suspicion. "What may constitute reasonable suspicion for a search of a locker or even a pocket or pocketbook may fall well short of reasonableness for a nude search." *Cornfield,* 991 F.2d at 1321.

4. In *M.M. v. Anker,* 607 F.2d 588 (2d Cir. 1979) (per curiam), a case decided before *T.L.O.,* we concluded that "when a teacher conducts a highly intrusive invasion such as [a] strip search ... it is reasonable to require that probable cause be present." *Id.* at 589. Though the probable cause standard of *Anker* no longer applies after *T.L.O.,* the concerns we expressed in *Anker* as to the seriousness of student strip searches should nonetheless inform our application of *T.L.O.'s* more flexible "reasonableness" standard. *But see N.G. v. Connecticut,* 382 F.3d 225, 240 (2d Cir.2004) (Sotomayor, J., concurring in part and dissenting in part) (citing *Anker,* in dicta, for the proposition that a student strip search requires probable cause).

Prompted by concerns similar to those of our Court, the Seventh Circuit in *Cornfield* correctly observed that "as the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness." *Id.; see also Anker*, 607 F.2d at 589 ("We are [ ] of the view that as the intrusiveness of the search intensifies, the standard of Fourth Amendment 'reasonableness' approaches probable cause, even in the school context."). With these principles in mind, we now consider whether this particular search was justified at its inception.

**A.**

The question, then, for us is whether the school officials had a reasonably high level of suspicion that Phaneuf had marijuana on her person to justify an intrusive, potentially degrading strip search. In addressing this question, we review the totality of the circumstances, looking first at those that might have created a reasonable suspicion that such a search was justified at its inception.[5] This review necessarily requires us to base our determination on only those facts known to the school officials *prior* to the search. *See Florida v. J.L.*, 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."); *United States v. Swindle*, 407 F.3d 562, 568 (2d Cir.2005) ("The settled requirement is, of course, that reasonable suspicion must arise · before a search or seizure is actually effected."); *DesRoches v. Caprio*, 156 F.3d 571, 577 (4th Cir.1998) ("[W]hether any given search was justified at its inception must be adjudged according to the circum-

stances existing at the moment that particular search began.").

■ Here, school officials point to four factors they contend created the reasonable suspicion required to justify the search: (1) the tip from a fellow student, (2) Phaneuf's past disciplinary problems, (3) the suspicious manner of her denial, and (4) the discovery of cigarettes in her purse. We conclude that these four factors—considered singly and together— were insufficient.

**1. The student tip**

■ "Informants' tips ... may vary greatly in their value and reliability." *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The Supreme Court has instructed courts to evaluate informants' tips based on the "totality of the circumstances," while allowing for the "lesser showing required" to meet the reasonable suspicion standard. *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *see also id.* at 330, 110 S.Ct. 2412 ("Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed ... and its degree of reliability. Both factors—quantity and quality—are considered in the totality of the circumstances—the whole picture that must be taken into account when evaluating whether there is reasonable suspicion."). The totality of the circumstances includes an informant's veracity, reliability, and basis of knowledge, as well as whether the information an informant has provided is corroborated by independent investigation, because an informant who is right about some facts is more likely to be right about others. *See United States v. Gagnon*, 373

---

**5.** In so doing, we occasionally draw upon the Supreme Court's "stop and frisk" or *"Terry* stop" jurisprudence, and we believe we are justified in doing so because the reasonable-

ness under all the circumstances test from *T.L.O.* was in part derived from the Supreme Court's decision in *Terry v. Ohio, supra.*

F.3d 230, 236 (2004); *see also Illinois v. Gates,* 462 U.S. 213, 241, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("decisions applying the totality-of-the-circumstances analysis have consistently recognized the value of corroboration of details of an informant's tip by independent police work"); *United States v. Canfield,* 212 F.3d 713, 719–21 (2d Cir.2000).

Cyr's tip was made face-to-face (to Birdsall, at least),[6] by a known informant. *See United States v. Salazar,* 945 F.2d 47, 50–51 (2d Cir.1991) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous [ ] tipster, for the former runs the greater risk that he may be held accountable if his information proves false."); *see also Adams,* 407 U.S. at 146–147, 92 S.Ct. 1921 (noting that information from a known informant who "came forward personally to give information" was stronger than that from an anonymous tipster). Cyr claimed that her knowledge was based on a direct conversation with Phaneuf, and the tip itself was relatively specific as to the type and location of the drugs at issue. Of course, Cyr did not claim that she actually saw the marijuana, or that she saw Phaneuf placing marijuana or anything else into her pants. *Cf. Cornfield,* 991 F.2d at 1319, 1322–23 (teacher aide's observation of a suspicious bulge in student's crotch area, corroborated by two other people, was one factor among many that raised a reasonable suspicion justifying strip search).

Birdsall's affidavit claimed that Cyr was a "trustworthy" student, and Cipriano's affidavit claimed that Cyr was "a highly respected and responsible office aid[e]." As a general rule, we are wary of vague or conclusory statements about an informant's reliability. *See United States v. Pena,* 961 F.2d 333, 339 (2d Cir.1992). There is no evidence that either Cipriano or Birdsall had ever previously relied on Cyr for information or knew Cyr to be a reliable source of information based on these past interactions. *See id.* at 340. Moreover, the record casts doubt as to whether Cipriano knew that the tip came from a respected and responsible student *prior* to the strip search. While Cipriano may have been entitled to rely on Birdsall's assessment of Cyr's trustworthiness or reliability, the record is devoid of the basis for Birdsall's belief that Cyr was a "trustworthy" student.

After receiving the tip, Cipriano apparently did not investigate, corroborate, or otherwise substantiate it prior to ordering the strip search. Cipriano's acceptance of one student's accusatory statement to initiate a highly intrusive search of another student—with no meaningful inquiry or corroboration—concerns us. *See C.B. v. Driscoll,* 82 F.3d 383, 388 (11th Cir.1996) (search of student's pocket based on informant's tip was reasonable because "[a]dministrators ... received at least some corroboration" of the tip); *cf. Gagnon,* 373 F.3d at 236 ("an informant who is right about some facts is more likely to be right about others"). School disciplinary matters are typically complicated and difficult, and nearly always best left to the expertise of professional educators. Exceptions arise at the seldom explored outer edges of these responsibilities, particularly in cases such as this involving a strip search (and not the search of pockets, a back pack, a locker or a desk drawer). While the uncorroborated tip no doubt justified additional inquiry and investigation by school

---

**6.** As mentioned above, *see supra* note 2, the record is unclear as to whether Cyr reported her information to Birdsall who then relayed the information to Cipriano, or whether Cyr reported the information directly to *both* Birdsall and Cipriano.

officials, we are not convinced that it justified a step as intrusive as a strip search.

## 2. Phaneuf's past disciplinary problems

■ A student's past history of drug use can be a factor adding to the mix in a school official's decision to conduct a strip search. *See, e.g., Cornfield,* 991 F.2d at 1322 (series of recent incidents involving drugs one factor in creating reasonable suspicion to justify strip search); *Williams,* 936 F.2d at 889 (student's father's alert to the school that he suspected his daughter was using drugs and student's production of a different illegal drug, among other factors, justified strip search); *cf. Hedges,* 204 F.3d at 117 (student manifesting symptoms of currently being on drugs and possessing unidentified pills created a reasonable suspicion to conduct strip search); *Bridgman v. New Trier High Sch. Dist. No. 203,* 128 F.3d 1146, 1149 (7th Cir.1997) (student manifesting symptoms of drug use justified limited search). Disciplinary problems by themselves are not necessarily indicia of drug abuse, because most school discipline problems do not involve drug abuse, although many of the most serious do. *Cf. Cornfield,* 991 F.2d at 1322 ("The fact that students in [ ] a [behavioral disorder] program exhibit inconsistent behavior and that drug users behave erratically does not lead inevitably to a conclusion that a student in a behavioral disorder program is a drug user."). In this case, we are unconvinced that Phaneuf's past discipline, none of which related to drug use, adds much of significance in determining the reasonableness of the initiation of a highly intrusive search, whose only purpose was to find drugs.

## 3. The "manner" of Phaneuf's denial

■ Under certain circumstances, the manner in which a person acts when confronted by law enforcement officials can be grounds for raising a reasonable suspicion to conduct a limited search, such as in the case of a stop and frisk, or *"Terry* stop." *See, e.g., United States v. Vargas,* 369 F.3d 98, 101 (2d Cir.2004) ("evasive flight" when approached by police officers, among other factors, justified *Terry* stop); *United States v. Paulino,* 850 F.2d 93, 98 (2d Cir.1988) ("furtive movement provided a legal basis for [a] protective search"). *Cf. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 270, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (Rehnquist, J., dissenting) ("[The witness] fidgets when answering critical questions, his eyes shift from the floor to the ceiling, and he manifests all other indicia traditionally attributed to perjurers."). Here, however, we are given little to work with. We only know that one of the factors leading to the initiation of the search was that Phaneuf denied the accusations against her in a "suspicious" manner, but neither Cipriano nor Birdsall provide any further detail. With a record devoid of any sort of explanation of what this "suspicious" manner might possibly mean, we are reluctant to permit it to supply justification for a strip search.

## 4. The contraband in Phaneuf's purse

We finally turn to the search of Phaneuf's purse and the discovery of the cigarettes and lighter. Contrary to the conclusion of the district court, we believe that the discovery of this particular contraband has such a tenuous connection to the alleged marijuana on her person so as to be of relatively little consequence in deciding whether the strip search for drugs was reasonable.

The facts surrounding the discovery of the cigarettes raise questions as to whether or not it was a justification for the initiation of the search, or merely later advanced as a justification after school offi-

cials had decided to conduct the search. According to Phaneuf's testimony, school officials apparently saw the cigarettes in her purse during the initial search immediately before boarding the bus for the school picnic—a search the parties do not dispute was specifically intended to discover "contraband." Yet, according to Phaneuf, the school officials apparently "didn't say a word" about the cigarettes at that time. More importantly, the re-checking of Phaneuf's bag only happened to occur prior to the strip search because Fraikin felt uncomfortable performing the search, and Cipriano looked in the bag while waiting for Phaneuf's mother to arrive. These facts raise questions as to whether Cipriano had made up her mind to conduct the search *before* she re-checked the bag.

Furthermore, the district court concluded that the discovery of the cigarettes was the linchpin of this case: that the cigarette generated a "heightened level of suspicion justif[ying] the extended level of intrusion necessary to conduct a search of Kelly Phaneuf's person." *Phaneuf*, 330 F.Supp.2d at 80. But the probative force of the cigarette find is limited, at best. Use of tobacco might be barely relevant if the school was interested in Phaneuf's marijuana use generally. It is of significantly less relevance in evaluating (1) whether Phaneuf brought marijuana to school and (2) whether she was smuggling marijuana in her clothing. The school acted unreasonably in treating all contraband alike: Surely, a discovery of cigarettes cannot alone support a suspicion that a student is carrying a firearm or is bootlegging gin. Without further explanation, the school cannot vault from the finding of one type of (commonly used) contraband, to a suspicion involving the smuggling of another.

\*       \*       \*       \*       \*       \*

Contrary to the district court's conclusion that the discovery of the cigarettes was the linchpin of this case, *Phaneuf*, 330 F.Supp.2d at 80, we believe that this case ultimately turns on whether the student tip was sufficient, either by itself or in conjunction with the other factors, to create a reasonable suspicion that Phaneuf possessed marijuana on her person that would justify the strip search. We are dubious that the other factors the district court relied on—the prior non-drug-related disciplinary problems; the suspicious manner in which Phaneuf denied the accusation; or the presence of cigarettes in her purse—add much to the reasonable-under-the-circumstances calculus. If anything, the district court's two-step analysis implies that the first three factors alone—the student tip, the past disciplinary problems, and the suspicious denial—were insufficient by themselves to justify the strip search, and only the discovery of the cigarettes pushed the suspicion level across the required threshold. Since we are not persuaded, we reverse.

### B.

Because we have concluded that the "justified at its inception" prong of the *T.L.O.* test was not met, we need not reach the question of whether the district court properly found that the search as conducted was "reasonable in scope." *T.L.O.*, 469 U.S. at 341, 342, 105 S.Ct. 733. Furthermore, because the district court found that the strip search of Phaneuf did not violate her Fourth Amendment rights, it did not reach the issue of qualified immunity. We leave it for the district court to resolve in the first instance.

### CONCLUSION

The judgment of the district court is REVERSED, and this case is REMANDED for

further proceedings consistent with this opinion.