**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

APRIL REDDING, legal guardian of
minor child,
             *Plaintiff-Appellant,*

                v.

SAFFORD UNIFIED SCHOOL DISTRICT
#1; KERRY WILSON, husband; JANE
DOE WILSON, wife; HELEN ROMERO,
wife; JOHN DOE ROMERO, husband;
PEGGY SCHWALLIER, wife; JOHN
DOE SCHWALLIER, husband,
             *Defendants-Appellees.*

No. 05-15759

D.C. No.
CV-04-00265-NFF

OPINION

Appeal from the United States District Court
for the District of Arizona
Nancy Fiora, Magistrate Judge, Presiding

Argued and Submitted
March 8, 2007—Tempe, Arizona

Filed September 21, 2007

Before: Michael Daly Hawkins, Sidney R. Thomas, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton;
Dissent by Judge Thomas

12853

## COUNSEL

Bruce G. Macdonald, G. Todd Jackson (argued), McNamara, Goldsmith, Jackson & Macdonald, P.C., Tucson, Arizona, for the plaintiff-appellant.

Matthew W. Wright (argued), David K. Pauole, Holm, Wright, Hyde & Hays, P.L.C., Phoenix, Arizona, for the defendants-appellees.

## OPINION

CLIFTON, Circuit Judge:

Plaintiff-Appellant Savana Redding, a minor, by her mother and legal guardian, appeals from the district court's order entering summary judgment in favor of Defendants Kerry Wilson, Helen Romero, Peggy Schwallier, and the Safford Unified School District, in this 42 U.S.C. § 1983 action for monetary damages. Redding alleges that Defendants violated her Fourth Amendment rights by conducting a warrantless search of her person during school hours and on school premises. Because we conclude that Defendants did not violate Redding's Fourth Amendment rights, we affirm the district court's order.

## I.  Background

A few years ago, Safford Middle School in Safford, Arizona, adopted a policy prohibiting the "nonmedical use, possession, or sale of drugs on school property or at school events." The term "drugs" is defined by the policy as including, but not limited to: (1) "[a]ll dangerous controlled substances prohibited by law," (2) "[a]ll alcoholic beverages," and (3) "[a]ny prescription or over-the-counter drug, except those for which permission to use in school has been grant-

ed." Although it is not entirely clear from the record, it appears that the school implemented this policy in response to a prior incident, in which a student brought a prescription drug to school and distributed it to classmates, one of whom became seriously ill and was hospitalized.[1]

On August 22, 2003, Safford Middle School held a dance to commemorate the beginning of a new school year. During the dance, several staff members from the school noticed "unusually rowdy behavior" from a small group of students, including Redding, who was then thirteen years old and entering eighth grade, and her friend Marissa. The staff members also detected the smell of alcohol coming from that group. Later that evening, staff members found a bottle of alcohol and a package of cigarettes in the girls' restroom. No official action was taken against any of the students at that time.

On October 1, 2003, Jordan, another student at Safford Middle School, along with his mother, requested a meeting with Principal Robert Beeman and Vice Principal Kerry Wilson. During the meeting, Jordan's mother explained that a few nights before, Jordan had become violent with her and was sick to his stomach. Jordan claimed that the incident occurred after he had taken some pills a classmate had given him. Jordan went on to inform Beeman and Wilson that certain students were bringing drugs and weapons to school. He then gave the administrators detailed accounts regarding the actions of several students, including Redding. Specifically, Jordan informed Beeman and Wilson that Redding had served

---

[1]Defendant Wilson alleged in his affidavit that Safford Middle School suffers from a "history of problems with students using and distributing prohibited and illegal substances on campus." In her affidavit, Redding disputed this allegation. Because this is an appeal from an order granting summary judgment to Defendants, we accept Redding's version of disputed facts as true. *See Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 n.1 (9th Cir. 2003).

alcohol to her classmates at a party she hosted at her home prior to the dance in August.[2]

On the morning of October 8, 2003, Jordan again asked to meet with Vice Principal Wilson. During the meeting, Jordan handed Wilson a white pill and said that Marissa had given it to him and that a group of students were planning to take pills at lunch. Upon learning this information, Wilson took the pill to Peggy Schwallier, the school nurse, and asked her to identify it. Schwallier identified it as "Ibuprofen 400 mg," a pill available only by prescription.

Based on this information, Wilson went to Marissa's classroom and asked Marissa to collect her belongings and accompany him to his office. As Marissa got up to comply, Wilson noticed a black planner lying on the desk next to hers. Wilson asked Marissa whether the planner belonged to her and Marissa said no. Wilson nevertheless picked up the planner and handed it to a teacher, who promised that he would attempt to find the owner. Soon thereafter, the teacher discovered that the planner contained knives, lighters, a cigarette, and a permanent marker. He promptly communicated this information to Wilson.

Wilson escorted Marissa back to his office and invited Helen Romero, an administrative assistant, to come in to observe. In Romero's presence, Wilson asked Marissa to turn out her pockets and open her wallet. Marissa did so, producing one blue pill, several white pills, and a razor blade. The blue pill was later identified as "Naprosyn 200 mg," an over-the-counter drug used to treat pain and inflammation. Wilson asked Marissa where the blue pill had come from, and

---

[2]In her affidavit, Redding admitted that she hosted a small get-together at her house prior to the dance, but denied serving alcohol. According to Redding, "[t]he only beverage served at the gathering was soda." We accept Redding's version of this disputed fact. *See Drummond*, 343 F.3d at 1054 n.1.

Marissa replied: "I guess it slipped in when she gave me the IBU 400s." When Wilson asked "who is she?," Marissa responded, "Savana Redding." Wilson then questioned Marissa about the black planner. Marissa denied ownership of the planner and claimed she had no knowledge of its contents.

At this point, Wilson asked Romero to take Marissa into the nurse's office and conduct a search of Marissa's person and clothing for pills. Romero complied. She took Marissa into the nurse's office and closed the door, which locked automatically. She then invited school nurse Schwallier to observe. In Schwallier's presence, Romero asked Marissa to: (1) remove her shoes and socks, (2) lift up her shirt and pull out her bra band, and (3) take off her pants and pull out the elastic of her underwear. Marissa complied with each request. The search of Marissa's person and clothing did not yield any more pills, and as soon as the search was over, Romero returned Marissa's clothes and permitted her to get dressed.

While Romero and Schwallier searched Marissa, Wilson retrieved Redding from her classroom and asked her to accompany him to his office. When they arrived, Wilson first admonished Redding about the importance of telling the truth. After Redding assured Wilson that she would be truthful, Wilson showed Redding the black planner he had found near Marissa's desk. Redding acknowledged that the planner belonged to her but claimed that she had lent it to Marissa several days earlier to help Marissa hide some things from her parents. Redding denied having any knowledge of the planner's contents.

Wilson then showed Redding the pills he had seized from Marissa and asked her what she could tell him about them. After Redding denied having knowledge of the pills, Wilson told Redding that he had received a report that she had been passing the pills out to her classmates and asked Redding if she would object to being searched. Redding denied bringing pills to school, denied distributing pills to her classmates, and

told Wilson that she did not mind being searched. Wilson then invited Romero into his office, and together, they conducted a search of Redding's backpack. After the search proved fruitless, Wilson asked Romero to take Redding into the nurse's office and conduct a search of her person. Romero complied.

Romero took Redding into the nurse's office and again invited Schwallier to observe. At the time of the search, Redding was wearing "stretch pants without pockets and a T-shirt without pockets." In Schwallier's presence, Romero asked Redding to: (1) remove her jacket, shoes, and socks, (2) remove her pants and shirt, (3) pull her bra out and to the side and shake it, exposing her breasts, and (4) pull her underwear out at the crotch and shake it, exposing her pelvic area. The search did not produce any pills. Immediately after it had concluded, Defendants returned Redding's clothes and allowed her to get dressed. At no point during the search did either Schwallier or Romero touch Redding. Prior to the search, no attempt was made to contact Redding's mother.

Redding subsequently brought this 42 U.S.C. § 1983 action against Wilson, Romero, Schwallier, and the Safford Unified School District. She alleges that Defendants' search of her person violated her Fourth Amendment rights. Defendants moved for summary judgment, arguing that they did not violate Redding's constitutional rights, and that even if they did, they were entitled to qualified immunity because the law was not "clearly established" at the time the search took place. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The district court granted Defendants' motion for summary judgment, holding that Defendants did not violate Redding's Fourth Amendment rights because their search of Redding's person was both justified at its inception and permissible in its scope. *See New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985). Redding timely appealed from the district court's order.

## II. Discussion

We review *de novo* the district court's grant of summary judgment. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146

(9th Cir. 2005). In doing so, "we view the evidence in the light most favorable to . . . the non-moving party, and accept the version of all disputed facts most favorable to [that party]." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 n.1 (9th Cir. 2003).

**[1]** The fundamental principle that "students do not 'shed their constitutional rights . . . at the schoolhouse gate' " is beyond reasonable dispute. *Morse v. Frederick*, 127 S. Ct. 2618, 2622 (2007) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). At the same time, the Supreme Court has admonished us that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings" and that "the rights of students must be applied in light of the special characteristics of the school environment." *See id.* (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)) (internal quotation marks omitted). It is in this context that we evaluate the constitutionality of the challenged search.

**[2]** The search of Redding's person was conducted by public school officials and took place during school hours and on school premises. The validity of the search is, therefore, governed by *New Jersey v. T.L.O.*, 469 U.S. 325 (1985). In that case, the Supreme Court held that the Fourth Amendment's protection against unreasonable searches and seizures extended to searches of students by public school officials and set forth the constitutional standard for adjudging the "reasonableness" of such searches. *See id.* at 333-37, 341-43; *see also Bd. of Educ. v. Earls*, 536 U.S. 822, 828 (2002) ("We must . . . review the School District's [search policy] for 'reasonableness,' which is the touchstone of the constitutionality of a governmental search."). According to the Court, the search of a student by a public school official is reasonable under the Fourth Amendment if it is both: (1) "justified at its inception," and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469

U.S. at 341 (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)) (internal quotation marks omitted). Under *T.L.O.*, a search is justified at its inception if there are "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 341-42. A search is permissible in its scope if "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

We agree with the district court that Defendants' search of Redding satisfied both of the *T.L.O.* criteria.

### 1. The Search was Justified at its Inception

[3] Based on the information available to them, Defendants had "reasonable grounds" for suspecting that the search of Redding's person would turn up evidence that Redding had "violated or [was] violating either the law or the rules of the school." *See T.L.O.*, 469 U.S. at 341-43. At the time Defendants searched Redding, they had several key pieces of information tying her to the possession and distribution of pills in violation of school policy. Earlier that morning, Jordan told Vice Principal Wilson that Marissa possessed pills, had distributed at least one of those pills to Jordan, and planned to get together with a group of students to take pills at lunch. Wilson discovered pills on Marissa's person during his search of her pockets and wallet. Marissa then volunteered that she had gotten the pills from Redding.

[4] While decisional law from this circuit is sparse, other circuits have held that students who provide information implicating other students in illegal or otherwise prohibited activities are tantamount to "informants," and have used case law from the criminal context to determine the circumstances under which such students' "tips" could give rise to reasonable suspicion sufficient to justify a search. *See*, *e.g.*, *Phaneuf*

v. *Fraikin*, 448 F.3d 591, 597-99 (2d Cir. 2006); *Williams v. Ellington*, 936 F.2d 881, 888 (6th Cir. 1991) ("We can correlate the allegations of a student, implicating a fellow student in unlawful activity, to the case of an informant's tip.").

In *Phaneuf*, for example, the Second Circuit held that a student informant's allegation regarding another student's marijuana possession, while warranting "additional inquiry and investigation," failed to justify the ensuing search of the suspected student's person. *Phaneuf*, 448 F.3d at 598-99. The court noted that while the student informant made the tip "face-to-face," claimed that her knowledge was based on a "direct conversation" with the plaintiff, and gave "relatively specific" information, her tip was nevertheless inadequate because there was no concrete evidence of her reliability, and the defendants had failed to make any effort to "investigate, corroborate, or otherwise substantiate [the tip] prior to ordering the strip search." *Id.* at 598.

**[5]** By contrast, in *Williams*, the Sixth Circuit held that a student informant's tip sufficed to justify the ensuing search of another student's person. 936 F.2d at 889. In that case, the court recognized that "[w]hile there is concern that students will be motivated by malice and falsely implicate other students in wrongdoing," it noted that the defendant in *Williams* had "carefully questioned [the student informant] about any improper motive for making the allegations, and was satisfied none existed." *Id.* at 888-89. In addition, the court pointed out that there was at least some independent evidence, separate and apart from the student's tip, that could have led the defendant to "reasonably suspect [the plaintiff of] concealing evidence of illegal activity on her person." *Id.* at 889.

**[6]** The instant case is more analogous to the circumstances of *Williams*. Like the defendant in that case, Wilson did not order the search of Redding's person based solely on an uncorroborated tip. *Cf. Phaneuf*, 448 F.3d at 598 ("[Defendant's] acceptance of one student's accusatory state-

ment to initiate a highly intrusive search of another student — with no meaningful inquiry or corroboration — concerns us."); *see also id.* at 598-99 ("While [an] uncorroborated tip no doubt justified additional inquiry and investigation by school officials, we are not convinced that it justified a step as intrusive as a strip search."). To the contrary, he made diligent efforts to "investigate, corroborate, or otherwise substantiate [the tip]" prior to ordering the search. *Cf. id.* at 598. Upon receiving Jordan's tip, which was given face-to-face, Wilson took reasonable steps to investigate Marissa, whom Jordan had implicated. *See United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous . . . tipster, for the former runs the greater risk that he may be held accountable if his information proves false."). He interviewed Marissa, asked her a number of in-depth questions regarding the pills, and conducted a search of her person and belongings. After Wilson discovered pills, Marissa immediately attributed them to Redding. Even then, Wilson still refrained from immediately conducting a search of Redding's person. To the contrary, he questioned Redding about her knowledge of the pills and her ownership of the black planner. It was only after Redding had acknowledged ownership of the planner, acknowledged her friendship with Marissa, and conceded that she had, in fact, lent her planner to Marissa with the express purpose of helping Marissa hide contraband from her parents, that Wilson proceeded to order the challenged search.

[7] There was also sufficient evidence to support Jordan's and Marissa's veracity. Jordan's tip was substantially corroborated by Defendant Wilson's subsequent investigation of Marissa. *See Phaneuf*, 448 F.3d at 597 (noting that an informant whose information is corroborated by independent investigation tends to be more reliable because "an informant who is right about some facts is more likely to be right about others"). Jordan's primary complaint was that Marissa possessed pills and had distributed at least one of the pills to him.

During the ensuing search of Marissa, Wilson did, in fact, find pills on Marissa's person.

**[8]** Ample facts supported Marissa's veracity as an informant, as well. It is undisputed that school employees had witnessed Redding and Marissa socializing with the same group of friends, and presumably with each other, at the August school dance. Redding also acknowledged a friendship between Marissa and herself during her interview with Wilson. Finally, and perhaps most significantly, during that same interview, Redding conceded to Wilson that she had lent Marissa her planner to help Marissa conceal contraband from her parents. The girls' friendship and prior interactions made Marissa's accusations against Redding credible, and Wilson acted reasonably in relying upon those accusations in justifying his further investigation, and ultimate search, of Redding.

**[9]** Finally, we note that there was at least some independent evidence, separate and apart from Jordan's and Marissa's respective tips, that supported Defendants' suspicion that Redding was involved with the pills. Jordan had previously informed Wilson that Redding distributed alcohol to her classmates at her home prior to a school dance in August. As previously discussed, we accept Redding's version of the disputed fact as true and assume, for purposes of this appeal, that Redding did not, in fact, serve alcohol at that party. But the fact that Jordan so informed the school officials was not disputed, and Redding has failed to show that this allegation, "even if untrue, w[as] not made or that [Defendants] could not reasonably believe [it] to be true." *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1323 (7th Cir. 1993). While this allegation, in itself, would not have been enough to justify Defendants' subsequent search of Redding, it was a relevant factor which the school officials were entitled to take into account. *See Phaneuf*, 448 F.3d at 599 ("A student's past history of drug use can be a factor adding to the mix in a school official's decision to conduct a strip search.").

**[10]** Accordingly, we conclude that the district court did not err in holding Defendants' search of Redding's person to be justified at its inception.

### 2.   *The Search was Permissible in Scope*

**[11]** Under the *T.L.O.* framework, the search of a student by a public school official must also be permissible in its scope. *See* 469 U.S. at 341-42. A search is permissible in its scope if "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

**[12]** As to scope of search, courts have looked to a number of factors. Many have considered, for example, the importance of the governmental interest at stake. *Compare Cornfield*, 991 F.2d at 1322-23 (upholding strip search aimed at finding drugs); *Williams*, 936 F.2d at 887 (accord), *with Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 605 (6th Cir. 2005) (invalidating strip search aimed at finding stolen money and noting that "a search undertaken to find money serves a less weighty governmental interest than a search undertaken for items that pose a threat to the health or safety of students, such as drugs or weapons"). Others have considered the size of the contraband to be found. *See Williams*, 936 F.2d at 887 ("Defendants were not unreasonable, in light of the item sought . . . a small vial containing suspected narcotics, . . . in conducting a search so personally intrusive in nature."). Some have also considered the physical setting and circumstances surrounding a search in determining the search's overall reasonableness. *See, e.g., Cornfield*, 991 F.2d at 1323; *Singleton v. Bd. of Educ.*, 894 F. Supp. 386, 391 (D. Kan. 1995). We assess each of these factors in turn and conclude that, under the facts of this case, Defendants' search of Redding's person was permissible.

**[13]** We begin by assessing the importance of the governmental interest at stake: barring the unauthorized use of pre-

scription drugs on school premises. While the inherent risks posed by prescription drugs, particularly ibuprofen, may not be as grave as the risks posed by the illegal substances at issue in some of the other cases, *see*, *e.g.*, *Cornfield*, 991 F.2d at 1322, it cannot be denied that prescription drugs have the potential to do great harm if misused. Wilson was specifically informed by Schwallier, the school nurse, that the pill in question was available only by prescription and thus had reason to take its potential distribution to other students seriously. Put more broadly, Defendants had a strong interest both in safeguarding students entrusted to their care from the harm posed by the misuse of prescription drugs and in enforcing the school's official policy, which prohibited the use, possession, and distribution of such drugs without permission. In addition, because Defendants had experienced at least one prior incident involving the misuse of prescription drugs, had recently been told that Jordan had become violent and sick to his stomach after taking pills given to him by a classmate, and were told that other students were planning to take pills together, they had good reason to be extra vigilant in monitoring the drugs' unauthorized use. The first factor, therefore, favors Defendants.

**[14]** Next, we turn to the size of the contraband to be found. This factor favors Defendants, as well. In *Williams*, the Sixth Circuit held that because school administrators were searching for "a small vial containing suspected narcotics," their "personally intrusive" search of the suspected student's person was not unreasonable. 936 F.2d at 887. Here, Defendants were similarly searching Redding for something small: pills. Moreover, they searched Redding's person only after receiving reliable information that Redding had pills, failing to find the pills in Redding's backpack, and observing that she was wearing clothes without pockets. *Cf. id*. (noting that "[a]fter [the student's] locker and purse were searched, it was reasonable for [the defendant] to suspect the girl may be concealing the contraband on her person"). In light of these factors, we hold that Defendants did not exceed the permissible scope of

the search when they asked Redding to remove her clothing and conducted a search of her person.

**[15]** Finally, we conclude that Defendants administered the search in a reasonable manner. The search of Redding's person was conducted by two employees who were of the same gender as Redding, and the search took place in the privacy of the school nurse's office with the door securely locked. *Cf. Beard*, 402 F.3d at 606 (noting that "[t]he fact that the search[ ] . . . did not occur in the presence of only school officials, but rather in the presence of other students, . . . supports the conclusion that the search[ ] w[as] unreasonable"). Redding was not physically touched in any way during the search, and she was not asked to remove her bra or underwear. Furthermore, Defendants returned Redding's clothing and permitted her to get dressed as soon as the search was over. *See, e.g., Cornfield*, 991 F.2d at 1323 (upholding a search under similar conditions); *Singleton*, 894 F. Supp. at 391 (accord). Under those facts, we cannot say that Defendants' search of Redding's person exceeded the permissible scope prescribed by the Supreme Court in *T.L.O.*

In a related vein, Redding argues that Defendants' search of her person exceeded its permissible scope because Defendants failed to utilize the least restrictive means possible. Specifically, Redding argues that Defendants did not contact Redding's mother prior to conducting the search or have Redding remove her clothing behind a screen. The Supreme Court has repeatedly held, however, that "reasonableness" under the Fourth Amendment does not require adherence to the least restrictive means. In rejecting a similar argument in *Board of Education v. Earls*, 536 U.S. 822 (2001), for example, the Court emphasized: "[R]easonableness under the Fourth Amendment does not require employing the least intrusive means, because 'the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.' " *Id.* at 837 (quoting *United States v. Martinez-Fuerte*,

428 U.S. 543, 556-57 (1976)) (internal alteration omitted); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 663 (1995) ("We have repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment."). Because Redding's argument in this respect has already been considered and rejected by the Supreme Court, we decline to credit it here.

## III.  Conclusion

**[16]** We conclude that Defendants' warrantless search of Redding's person during school hours and on school premises did not violate Redding's Fourth Amendment rights. Accordingly, we affirm the order of the district court granting summary judgment in favor of Defendants.

**AFFIRMED**.

---

THOMAS, Circuit Judge, dissenting:

I must respectfully part company from my friends in the majority. As we have said "[i]t does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human dignity." *Calabretta v. Floyd*, 189 F.3d 808, 819 (9th Cir. 1999) (internal quotation marks omitted).

Thirteen-year-old Savana Redding, an honor roll student with no prior disciplinary problems, was required to strip, exposing her breasts and pubic area, in a fruitless search for — at worst — prescription strength ibuprofen.[1] Savana had no

---

[1]The school makes much of the fact that the ibuprofen tablets were "prescription strength." However, the policy upon which the school relies for justifying the strip search specifically includes over-the-counter medi-

history of drug involvement of any type, nor was she alleged to have any connection to illegal drug distribution. Rather, school officials based their actions entirely on uncorroborated statement by a student that Savana had given her a few ibuprofen tablets. The school officials did not suspect that the pills were something other than ibuprofen. The nurse recognized the pill immediately as an ibuprofen tablet. At no point did the school officials ask Savana's mother to be present for the search, nor did they permit Savana to call her mother or any other relative during her two and a half hour detention. School officials discovered nothing in the search. Given these circumstances, I would hold that the unwarranted intrusion on Savana's privacy violated the Fourth Amendment.

The majority and I agree that the proper standard for evaluating the constitutionality of the search is dictated by *New Jersey v. T.L.O.*, 469 U.S. 325 (1985). In applying this standard, the majority holds that the strip search of Savana was (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341 (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)) (internal quotation marks omitted). I disagree on both counts.

School officials may have had sufficient information to perform some kind of search of Savana for prescription-strength ibuprofen. There is little question that a search of Savana's backpack and her pockets would be constitutionally permissible, given that Savana's friend and classmate Marissa had

cations. There is nothing in the record to indicate that Savana was being strip searched because the ibuprofen was "prescription strength." Rather, the record seems to indicate that school was just searching for generic "pills." The "prescription strength" tablet was 400 mg; the over-the-counter tablets, marketed as Advil or Motrin are 200 mg. In any case, Savana has consistently denied that the pills were hers, and the school does not contend that the pills possessed by the other student were, in fact, Savana's.

reported that Savana had provided her with the ibuprofen. But the appropriate inquiry is whether a *strip search* was justified at its inception. *See, e.g.*, *Phaneuf v. Fraikin*, 448 F.3d 591, 597-600 (2d Cir. 2006); *Cornfield v. Consolidated High Sch. Dist.*, 991 F.2d 1316, 1321 (7th Cir. 1993).

The only credible connection between Savana and an impending distribution of prescription-strength ibuprofen was Marissa's statement that Savana had provided her with the pills found on her person. However, our sister circuits have concluded — properly in my view — that student tips alone are insufficient to support a constitutionally permissible strip search. *See Phaneuf*, 448 F.3d at 598-99 ("While the uncorroborated tip no doubt justified additional inquiry and investigation by school officials, we are not convinced that it justified a step as intrusive as a strip search."); *Williams v. Ellington*, 936 F.2d 881, 888 (6th Cir. 1991). To overcome this legal difficulty, the school attempts to additionally justify the search on the basis that (1) Jordan falsely reported that Savana, several months prior, had a party at her home at which alcohol was served; (2) Savana admitted to owning a planner — later discovered to contain cigarettes, lighters, and a knife — that she had given to her friend Marissa.[2] The school does not explain how this information sufficiently corroborates and supports a strip search for *pills*. Indeed, the Second Circuit recently held that violation of a school's tobacco policy cannot be the basis of a strip search for another drug. *Phaneuf*, 448 F.3d at 599-600; *see also Cornfield*, 991 F.2d at 1321 (" 'Justified at its inception' in the present context does not mean that a school administrator has the right to

---

[2]As I noted earlier, Savana has consistently denied, both to the school officials, and to the court under penalty of perjury, that she supplied the pills to Marissa. She affirmatively declared that she had never brought prescription pills to school and had never given any pills to any student. She denies that any of the objects found in the planner were hers. She affirmatively alleges that she knows that the objects were owned by Marissa. She denies that alcohol was served at her house, and the school has essentially conceded that this was false accusation.

search a student who merely acts in a way that creates a reasonable suspicion that the student has violated *some* regulation or law." (emphasis in original)). Under the school's reasoning, it is difficult to see how any student who was identified by Marissa would be safe from a strip search by school officials.

In order to justify such an invasive procedure, school officials must be required to show more than the circumstances presented in this case. *See Cornfield*, 991 F.3d at 1321 ("As the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness."). Strip searches are among the most intrusive searches. The Seventh Circuit has described strip searches as "demeaning," "dehumanizing," and "terrifying." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983). The Tenth Circuit has called them "terrifying." *Chapman v. Nichols*, 989 F.2d 393, 396 (10th Cir. 1993). The Eighth Circuit has called them "humiliating." *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982). Strip searches of children pose special concerns. *Cornfield*, 991 F.3d at 1321 ("no one would seriously dispute that a nude search of a child is traumatic"); *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005) ("Students of course have a significant privacy interest in their unclothed bodies."). In addition, we must be aware of the fact that the potential for humiliation is particularly acute for a thirteen-year-old girl. *See Calabretta*, 189 F.3d at 819; *Cornfield*, 991 F.3d at 1321 n.1 ("As children go through puberty, they become more conscious of their bodies and self-conscious about them. Consequently, the potential for a search to cause embarrassment and humiliation increases as children grow older."); *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) ("youth . . . is a . . . condition of life when a person may be most susceptible . . . to psychological damage").

Even assuming that the search was justified at its inception, it is clear that the search performed by school officials was not reasonable in scope as secondarily required by *T.L.O*. I

again agree with majority that the correct standard is whether "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.* 469 U.S. at 341-42. I disagree, however, with the assertion that the search of Savana's person was reasonable in scope. It was unreasonable to force Savana, a thirteen-year-old girl, to expose her breasts and pubic area to school officials. It was unreasonable not to call Savana's mother during the two and a half hours she was detained. It was unreasonable, given that officials had no evidence that alternative methods of concealment were employed, to probe further than her backpack and outer pockets.

The school makes much of the fact that Savana was not asked to remove her bra and underwear. School officials asked Savana to pull out her bra band to the side and shake it, which exposed her breasts. They also asked Savana to pull her underwear elastic and shake it and pull out and shake the crotch of her underwear, which exposed her pubic area. Under these circumstances, it is difficult to see how the fact that school officials did not completely undress her is of any constitutional significance. Indeed, perhaps the most alarming aspect of the school's position is that the school officials seem to believe that strip searching of students should be considered a routine matter. Marissa was strip searched for ibuprofen (and nothing was found) prior to the strip search of Savana. When Savana's mother complained about the search the next day, she was told by the principal that there was no problem "because we didn't find anything."

The school also relies on the significant interest school officials have in safeguarding the health of their students and enforcing their anti-drug policy. No one doubts the value of protecting young students from the dangers of illicit drug use. But ibuprofen, aspirin, and acetaminophen do not, shall we say, usually spring immediately to mind when we consider illegal drug trafficking operations in our schools. In any case,

the societal interest in discouraging illegal drug use does not obviate our duty to find some meaningful connection to these dangers and the student who is to be deprived of her dignity. To the contrary, *T.L.O.* requires school officials to undertake reasonable, commensurate action in response. This common sense requirement allows parents to rest assured that their children will not be stripped and searched without their knowledge or participation for allegedly giving another student the equivalent of two Advils.

The conclusion that a strip search of a child may be constitutionally justified on the basis of uncorroborated rumor directly conflicts with the Second Circuit's contrary conclusion in *Phaneuf v. Fraikin*. In *Phaneuf*, the Second Circuit held that the student's Fourth Amendment rights had been violated by an unreasonable search by school officials. School officials had received a student tip that eighteen-year-old Phaneuf planned to hide marijuana "down her pants." 488 F.3d at 593. When confronted by school officials, Phaneuf denied possessing marijuana. *Id.* Officials searched Phaneuf's purse and found cigarettes and a lighter — in violation of school policy. *Id.* at 594. Phaneuf's mother was then called, who conducted a strip search of Phaneuf behind a closed curtain. Even with Phaneuf's mother present, and behind a closed curtain, the Second Circuit found the search to be unreasonable, holding that (1) officials were required to "investigate, corroborate, or otherwise substantiate" the student tip, (2) Phaneuf's non-drug disciplinary history could not support a strip search, (3) "suspicious" denial of possession of contraband also cannot support a strip search, and (4) the connection between tobacco possession and drug possession is far too attenuated to justify a strip search. *Id.* at 597-600. Savana not only had no history of drug abuse, but was an honor student with no disciplinary trouble whatsoever. In addition, unlike in *Phaneuf*, school officials had no cause to believe that Savana was hiding anything in her clothing. More to the point, the only connection between Savana and an impending pill distribution — aside from Marissa's unsubstantiated tip — was

possession of the planner containing cigarettes in violation of school policy.

Certainly, some strip searches have been upheld under circumstances far different from the one at bar. *See, e.g., Cornfield*, 991 F.2d at 1322 (justifying a search where the student, an enrollee in a behavioral disorder program and a drop-out from a drug rehabilitation program, had an unusual "bulge" in the crotch area of his pants, had previously informed officials that he had "crotched" drugs during a police raid, and was known to have possessed drugs while on school grounds); *Williams*, 936 F.2d at 882-83 (justifying a search when officials had (1) statements from other students witnessing the plaintiff actually using the drug, (2) a report from a teacher that the student had written notes about using drugs, (3) received reports from the plaintiff's parent that she was using drugs, (4) a report from a student the day of the search that the plaintiff had drugs on her in a small glass vial.). These cases are quite distinguishable from the case at bar. Indeed, no federal case to examine the question extends official discretion as far as today's holding.

The school's strip search of Savana Redding violated the Fourth Amendment. To hold otherwise would be to conclude that her constitutional rights did, in fact, disappear at the schoolhouse gate. I would reverse the judgment of the district court.